United States District Court
Southern District of New York

UNITED STATES OF AMERICA          )
                                  )
    -v-                           )          07 Cr 1095
                                  )          (SAS)
ALEXANDER CONCEPCION              )


## MEMORANDUM OF LAW IN SUPPORT OF ALEXANDER CONCEPCION'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

### I.    Preliminary Statement

The memorandum of law is respectfully submitted on behalf of Alexander Concepcion ("Concepcion") in support of his pretrial motion to suppress wiretap evidence and statements obtained by law enforcement authorities on or about August 8, 2007.

By Indictment No. 07 Cr 1095, Concepcion stands accused of one count of conspiracy to distribute over fifty (50) grams of cocaine-base.  Concepcion has entered a plea of not guilty.

### II.   Factual Background:

#### A.    The First Wiretap Application

On June 20, 2007, the Government submitted an application for authorization to intercept wire communications from Concepcion's cellular telephone (the "cellphone") for thirty (30) days.  See Exhibit B to Mundy Declaration.  According to the application, the Government sought such authorization due to Concepcion's alleged involvement in the planning of the following offenses: (1) transport or receipt of explosives; (2) laundering of money in connection with transfers of funds outside of the United States; (3) use of weapons

of mass destruction within the United States; (4) bombing of a
public transportation system; and (5) provision of material support
to a designated foreign terrorist organization. Exhibit B at 3. The
application contains no mention of narcotics trafficking.

The application was signed by Judge Hellerstein on the date of
its submission. On July 2, 2007, the Government provided a report
to Judge Hellerstein describing certain communications intercepted
during the first ten days of surveillance ("the periodic report").
See Exhibit C to Mundy Declaration. In addition to two calls
purportedly related to firearms trafficking, the periodic report
describes an intercepted call involving an alleged narcotics
transaction. During the call, Concepcion and an individual named
"G" discuss an alleged plan to stash drugs in a car and then at a
location near Concepcion's house. Exhibit C at 115-16. The report
maintains that the call, while unrelated to the offenses for which
the application was obtained, is nonetheless pertinent to the
investigation of those offenses. Exhibit B at 115.

On July 10, 2007, the Government submitted a second periodic
report to the Court. See Exhibit D to Mundy Declaration. The
report references a single conversation allegedly involving
Concepcion's plans to attempt to obtain a small caliber handgun.
The report also describes a call in which Concepcion was asked by an
unknown individual if he had a "picture" of hair "grease." Exhibit
D at 120. The monitoring agents believed that the call involved

Concepcion's plan to show a prospective drug buyer a sample of
narcotics.  Additionally, the report lists a call in which
Concepcion and another man "discussed money" and referred to "two
ounce[s]."  Exhibit D at 120.  The agents believed that this call
referenced a debt owed to Concepcion.  Again, the report
acknowledges that the purported conversations are outside the scope
of the offenses enumerated in the surveillance application.

On July 20, 2007, the Government submitted a final periodic
report to Judge Hellerstein.  See Exhibit E to Mundy Declaration.
The report summarizes two separated calls in which Concepcion and
individuals named "Bienve" and "Johnny Santana" purportedly discuss
the sale of cocaine.  Exhibit E at 132-33.  In addition, the report
lists a call in which Concepcion and another person may have
referenced a planned robbery, before abandoning those plans.  Id.
Finally, the report represents that "the wire intercepts and other
investigation to date still have not accomplished the authorized
objectives" and reflects the Government's intention "to seek
authorization immediately to resume wire interceptions on
[Concepcion's] cellphone."   Exhibit E at 134.

**B.    The Second Wiretap Application**

On July 20, 2007, the same day as the expiration of the first
application, the Government submitted a second application for
authorization to monitor Concepcion's cellphone communications.  See
Exhibit F to Mundy Declaration.  Notably, the second application

-3-

omits any reference to the terror-related crimes for which the first application was sought.  Instead, the Government requests authorization to monitor Concepcion's cellphone for evidence of drug possession and trafficking.  Exhibit F at 3. In addition, the Government avers that "normal investigative techniques have been tried and have failed or reasonably appear unlikely to succeed if tried."  Exhibit F at 4.  According to an affidavit accompanying the application, such investigative techniques failed, in large part, because Concepcion "repeatedly chang[ed] cars" and "[drove] in an erratic manner." See Exhibit G to Mundy Declaration at 21.  The application was granted.

On July 31, 2007, the Government submitted a periodic report to Judge Marrero, which summarizes two conversations during which the parties purportedly use slang to discuss a drug deal and the planned robbery of a customer.  See Exhibit H to Mundy Declaration at 199. On August 10, 2007, the Government submitted a second periodic report to the Court.  The report contains summaries of three calls allegedly referencing drug transactions, including an August 8, 2007 call that forms the basis for the instant charge.  See Exhibit I to Mundy Declaration at 205.

On August 22, 2007, the Government submitted a final periodic report to Judge Marrerro.  See Exhibit J to Mundy Declaration.  The report summarizes three calls in which Concepcion and others allegedly make veiled references to the acquisition of ammunition

-4-

for a firearm, the robbery of a parking lot, and the theft of a rental car.  Exhibit J at 209-10.  The report does not include any information as to calls for drug possession or trafficking.  In the final report, the Government avers that "progress was made toward the achievement of the authorized objectives" of the wiretap and does not request additional authorization for continued surveillance.  Exhibit J at 211.

On November 16, 2007, Concepcion was arrested and charged with conspiracy to possess with intent to distribute over fifty (50) grams of cocaine-base.  The charge is based solely on a monitored cellphone conversation between Concepcion and another individual obtained under the authority of the second wiretap application.  No other individuals were arrested in connection with the alleged transaction.  Likewise, the drugs allegedly sold during the transaction were not recovered.

## II.  Argument

### A.    Concepcion has Standing to Challenge the Wiretap

The authority to intercept wire communications is conferred under 18 U.S.C. §§2510-2522 [Title III of the Omnibus Crime Control and Safe Streets Act of 1968].  These statutes, collectively known at "Title III," allow any "aggrieved person" to move to challenge the legality of a wiretap and to seek the suppression of the contents of illegally intercepted communications.  18 U.S.C. §§2515, 2518(10)(a).  An "aggrieved person" includes any "person who was a

-5-

party to any intercepted wire, oral or electronic communication." 18 U.S.C. §2510(11); see also Alderman v. United States, 394 U.S. 165, 175-76 (1969); United States v. Ruggiero, 928 F.2d 1289, 1302-03 (2d Cir. 1991)(opining that the "aggrieved person" provision is to be construed in accordance with standing requirements applied to suppression claims under the Fourth Amendment.)  Since Concepcion was a participant in conversations intercepted over the cellphone pursuant to the wiretap– and the monitored calls originated from, or were made to, his cellphone number, he has standing to challenge its legality.

**B.    The Wiretap Fails to Establish the Unavailability of Alternative Investigative Techniques.**

The essential function of Title III is "to prohibit, on the pain of criminal and civil penalties, all interceptions of oral and wire communications," except upon the fulfillment of certain restrictive conditions.  United States v. Giordano, 416 U.S. 505, 514 (1974).  First, under Title III, a wiretap may be effected only when a federal judge determines there is probable cause to believe a specific offense has been, is being, or will be committed, and that wire communications will reveal pertinent information.  18 U.S.C. §2518(1).  In addition, Title III includes a spectrum of other precautionary measures that must be met prior to wiretap authorization, among the most important: the communications to be intercepted must be specifically described; normal investigative procedures must be shown to be inadequate or inappropriate; the

-6-

duration of the wiretap must not exceed thirty (30) days; efforts must be made to minimize the interceptions which do not relate to the subject matter of the investigation; and frequent progress reports must be made to the authorizing judge. 18 U.S.C. §2518(1),(3),(5).

In order to satisfy the "failure of normal investigative procedure" requirement, the Government must submit "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" 18 U.S.C. §2518(3). The requirement assures that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12 (1974)(citing S. Rep. No. 1097, 90th Cong., 2d Sess., 101); United States v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983)("The requirement for a "full and complete statement". . .serves both to underscore the desirability of using less intrusive procedures and to provide courts with some indication of whether any efforts were made to avoid needless invasion of privacy.")

Indeed, the Government must demonstrate with specificity why ordinary means of investigation are inadequate in the investigation at hand. United States v. Miller, 116 F.3d 641, 663-65 (2d Cir. 1997)(holding that District Court did not err in finding that normal investigative procedures were exhausted based upon Government's

-7-

position that it "had been investigating a [drug trafficking ring] for some years and had nearly exhausted its battery of traditional investigative techniques with little significant success")(emphasis supplied); see also United States v. Williams, 580 F.2d 578 (D.C. Cir. 1978)(rejecting wiretap applications that use "generalized and conclusory statements" that misstate or overstate the difficulties involved using alternative investigate techniques).

Moreover, Section 2518(3) strictures are crucial in order to ensure that surreptitious interception of communications is under taken with restraint and not "routinely employed as the initial step in criminal investigation." U.S. v. Giordano, 416 US 505, 515 (1974).  This Circuit agrees:

> The framers of Title III presumably intended by this requirement to prevent evasion of the several restrictions upon original applications (e.g. showing of probable cause, enumerated serious crime, ineffectiveness of other investigatory techniques as to that offense). Otherwise, the applicant could easily name one crime while in fact he may have intercepted evidence of a different crime for which the prerequisites could not be satisfied. Such "subterfuge searches," to addition to the dissonance with Title III, would indeed run afoul of the Fourth Amendment. Without a judge's determination of inadvertence, Title III authorization might rapidly degenerate into what Justice Clark recently termed 'the electronic equivalent…of a "general search warrant."'

U.S. v. Marion, 535 F.2d 697, 700-701 (2nd Cir. 1976)(citing U.S. v. Brodson, 528 F.2d 214 (7th Cir. 1975)).

In the instant case, the second wiretap application and subsequent order authorizing the interception of calls concerning

-8-

the narcotics conspiracy fail to comport with 18 U.S.C.A. §
2518(3)(c).  Put simply, the government did not start the
narcotics investigation of Concepcion- at that point, a suspected
low-level drug dealer- by employing techniques proven to bear
fruit in similar cases.  Instead, they immediately resorted to
wiretapping and added after-the-fact justifications for their
actions, such as Concepcion's apparent penchant for driving
multiple cars and his elusiveness behind the wheel.  Such an
approach directly contravenes the language of Section 2518(3)(c),
which requires the use of traditional investigative measures
prior to the inception of wiretapping.  Giordano, supra; Lilla,
699 F.3d at 105 (rejecting use of wiretapping "as a substitute
for standard investigative procedures, a result that [Title III]
is designed to avoid.")

The Government attempts to undergird its scant references to
Concepcion's slipperiness with the same boilerplate allegations
contained in the first wiretap application (and virtually every
other like application).  The application asserts that physical
surveillance had not been successful, and that toll records, pen
registers, grand juries, and search warrants would be of limited
usefulness.  Exhibit G at 19-22.  These bald assertions, without
more, are insufficient.

Notably, the affidavit does not contain any meaningful
discussion regarding the use of informants or undercover law

enforcement agents, an investigative tool often used in narcotics trafficking cases. Here, the Government could have used- or attempted to use- information gathered through the initial wiretap application, such as the names of individuals to whom Concepcion spoke, their telephone numbers, and the addresses to which those numbers were registered, to orchestrate a controlled drug transaction, identify a potential cooperator, or conduct ongoing visual surveillance of Concepcion's residence (where he purportedly stashed drugs). Alternatively, with minimal effort or resource expenditure, a law enforcement agent could have called Concepcion and posed as a prospective client. The Government had ample basis for surmising that Concepcion was not a high-level dealer or otherwise insulated from easy access by law enforcement. Admittedly, these strategies, though frequently successful in drug investigations, may have failed. Regardless, the Government was obligated to explore them before seeking a wiretap.

To be sure, establishing the need for a wiretap is "far from an insurmountable hurdle." U.S. v. Tomero, 462 F.Supp.2d 565, 570 (S.D.N.Y. 2006)(citations omitted). The Government must demonstrate only that it has made "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." U.S. v. Villarman –Ovielo, 325 F.3d 1, 9 (1st

Cir. 2003).  Moreover, mere common sense and practicality serve as a Court's guideposts in determining whether alternative investigative techniques are satisfactorily exhausted.  <u>United States v. Diaz</u>, 176 F.3d 52, 111 (2d Cir. 1999).  Still, the Government fell well short of the investigatory bar here, merely noting that, in addition to Concepcion's daredevil driving, narcotics traffickers "are generally surveillance conscious." <u>See</u> Paholsky affidavit at 21.  Such generic averments apply to most, if not all, suspected drug dealers, from street peddlers to kingpins.  Without question, the net cast by Title III was not intended to ensnare the telephone communications of all such individuals.

In sum, when the Government's investigative focus switched from the alleged terrorist plot to a smattering of suspected hand-to-hand drug exchanges, it was required, in turn, to shift its investigative methods.  It failed to do so, instead piggy-backing on the first wiretap authorization and forgoing even cursory attempts at alternative and less intrusive investigative techniques.  This approach violated the clear mandates of Title III.  As a result, all evidence and statements derived from the second wiretap application must be suppressed.

## III. Conclusion

**Wherefore**, it is respectfully requested that this Court enter an order suppressing any evidence and statements obtained

as a result of the unlawful surveillance of Concepcion's

cellphone.

Dated: New York, New York
       March 28, 2008

                              LEONARD F. JOY, ESQ.
                              Federal Defenders of New York, Inc.
                              Attorney for Defendant
                              **ALEXANDER CONCEPCION**
                              52 Duane Street - 10th Floor
                              New York, New York  10007
                              Tel.:  (212) 417-8737

                              /s Hugh M. Mundy
                              HUGH M. MUNDY
                              Of Counsel


TO:  **MICHAEL J. GARCIA, ESQ.**
     United States Attorney
     Southern District of New York
     One St. Andrew's Plaza
     New York, New York  10007
     Attn.:  **JOHN T. ZACH, ESQ.**
             Assistant United States Attorney

-12-

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**ALEXANDER CONCEPCION,**
**a/k/a "Alex Concepcion,"**

**Defendant.**

## INDICTMENT

07 Cr.

(18 U.S.C. § 846)

<u>MICHAEL J. GARCIA</u>
United States Attorney.

**A TRUE BILL**

_____ Foreperson.

*Indictment filed, case assigned to Judge Scheindlin. —*

*J. Maas, USMJ*

*12/4/07*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x
                                    :
UNITED STATES OF AMERICA
                                    :
              - v. -
                                    :        INDICTMENT
ALEXANDER CONCEPCION,               :        07 Cr.
       a/k/a "Alex Concepcion,"
                                             **07 CRIM 1095**
              Defendant.            :

- - - - - - - - - - - - - - - - - -x

COUNT ONE

The Grand Jury charges:

1. From in or about June 2007 through in or about August 2007, in the Southern District of New York and elsewhere, ALEXANDER CONCEPCION, a/k/a "Alex Concepcion", the defendant, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of said conspiracy that ALEXANDER CONCEPCION, a/k/a "Alex Concepcion", the defendant, and others known and unknown, would and did distribute, and possess with intent to distribute, a controlled substance, to wit, approximately 50 grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: DEC 0 4 2007

commonly known as "crack cocaine", in violation of Sections 812,

841(a)(1) and 841(b)(1)(A) of Title 21, United States Code.

<u>OVERT ACTS</u>

3.    In furtherance of the conspiracy, and to effect

the illegal object thereof, the following overt act, among others,

was committed in the Southern District of New York and elsewhere:

a.    On or about August 8, 2007, ALEXANDER

CONCEPCION, a/k/a "Alex Concepcion", the defendant, participated

in a sale of crack cocaine that occurred in upper Manhattan, New

York.


(Title 21, United States Code, Section 846.)


FOREPERSON

MICHAEL J. GARCIA
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN THE MATTER OF THE APPLICATION OF
THE UNITED STATES OF AMERICA FOR
AUTHORIZATION TO INTERCEPT WIRE
COMMUNICATIONS OCCURRING OVER A CELLULAR
TELEPHONE ASSIGNED CALL NUMBER 347-680-
7262, AND BEARING IMSI 316010160198103,
AND UFMI 176*887*8959

APPLICATION FOR
AUTHORIZATION TO
INTERCEPT WIRE
COMMUNICATIONS

---

STATE OF NEW YORK          )
COUNTY OF NEW YORK         : ss.:
SOUTHERN DISTRICT OF NEW YORK  )

MICHAEL FARBIARZ, Assistant United States Attorney in
the Southern District of New York, being duly sworn, states:

1.   I am an "investigative or law enforcement officer"
within the meaning of Section 2510(7) of Title 18, United States
Code, that is, an attorney authorized by law to prosecute or
participate in the prosecution of offenses enumerated in Section
2516 of Title 18, United States Code.

2.   Pursuant to the authority vested in him by Section
2516 of Title 18, United States Code, by Order Number 2758-2005
of February 24, 2005, the Attorney General of the United States
has specially designated appropriate officials of the Criminal
Division to exercise the power conferred on him by Section 2516
of Title 18, United States Code, to authorize applications for a
court order authorizing the interception of wire and oral
communications.  Under the power delegated to him/her by special
designation of the Attorney General, an appropriately designated
official in the Criminal Division has authorized this
application.  A copy of that official's letter authorizing this

36

application, as well as a copy of the Attorney General's Order designating that official, are attached as EXHIBIT A.

3.    This application is for an Order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications occurring over the cellular telephone assigned call number (347) 680-7262, with International Mobile Subscriber Information ("IMSI") number 316010160198103, and Universal Fleet Mobile Identification ("UFMI") number 176*887*8959, a cellular telephone with subscriber information of GSD LML, 98 Post Avenue, New York, New York, with service provided by Sprint/Nextel Corporation (the "TARGET CELLPHONE").

4.    I have discussed the circumstances of this application with numerous law-enforcement agents, including Michael N. Rossanova, a Supervisory Special Agent of the Federal Bureau of Investigation ("FBI"), who has participated in the investigation herein; I have examined his affidavit submitted in support of this application (attached to this application as EXHIBIT B and incorporated by reference herein); and I therefore state, upon information and belief, that:

### Subjects and Offenses

5.    There is probable cause to believe that ALEXANDER CONCEPCION, a/k/a "Alex Concepcion," FNU LNU #1, FNU LNU #2, and others as yet unidentified (the "TARGET SUBJECTS") have conspired

2

37

to commit, and are conspiring to commit, the following offenses: transport or receipt of explosives; laundering of money in connection with transfers of funds outside of the United States; use of weapons of mass destruction within the United States; bombing of the public transportation system; and provision of material support to a designated foreign terrorist organization, in violation, respectively, of Title 18, United States Code, Sections 844(d), 1956(a)(2), 2332a(a), 2332f, and 2339B.

### The Designated Cellular Telephone

6.    There is probable cause to believe that the TARGET SUBJECTS will in the future use the TARGET CELLPHONE to facilitate, accomplish, and to commit the offenses described in paragraph 5, above.

7.    There is probable cause to believe that the TARGET CELLPHONE will be used during the period of interception applied for herein by some of the TARGET SUBJECTS, and others as yet unknown, in order to accomplish, to discuss, and to commit the offenses described in paragraph 5, above.

3

**Venue**

8.   It is anticipated that the TARGET SUBJECTS will use the TARGET CELLPHONE to place calls and relay other wire communications to and from the Southern District of New York, as well as other locations.  This belief is supported by the facts described below and in Exhibit B.

**Objectives**

9.   There is probable cause to believe that wire communications will reveal:  (i) the plans and methods of operation of the TARGET SUBJECTS as they participate in the TARGET OFFENSES; (ii) the nature and extent of the TARGET SUBJECTS' participation in the TARGET OFFENSES; (iii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iv) the locations and items used by the TARGET SUBJECTS in furtherance of their commission of the TARGET OFFENSES; (v) the existence and locations of records that relate to the TARGET OFFENSES; and (vi) the sources of resources used by the TARGET SUBJECTS to finance their illegal activities.  The key objective of this investigation is to obtain information — in particular, admissible evidence of the commission of the TARGET OFFENSES — that relates to each of the six above-listed categories.  It is expected that monitoring, if authorized, will provide valuable evidence against the perpetrators of the above

4

39

described offenses that cannot reasonably be obtained by other means.

### Other Investigative Procedures

10.  As set forth more fully in EXHIBIT B, normal investigative techniques have been tried and have failed or reasonably appear unlikely to succeed if tried.

### Prior Applications

11.  As set forth in EXHIBIT B, I have been informed that a review of electronic surveillance indices of the FBI was completed on June 11, 2007.  Based on these reviews, I have been informed that there have been no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS, or to intercept wire, oral, or electronic communications over the TAREGT CELLPHONE.

WHEREFORE, I believe that probable cause exists to believe that some or all of the TARGET SUBJECTS, during the period of interception applied for herein, will use the TARGET CELLPHONE to communicate with each other and with others as yet unknown, in connection with the commission of the above-described offenses.  I also believe that, if the interception herein applied for is authorized by this Court, wire communications of the TARGET SUBJECTS concerning those offenses will be intercepted.

On the basis of the allegations contained in this application and on the basis of the attached affidavit of Supervisory Special Agent Rossanova:

IT IS HEREBY REQUESTED that this Court issue an Order pursuant to the power conferred on it by Section 2518 of Title 18, United States Code, authorizing Special Agents of the FBI, and other investigative and law enforcement officers, assisted, if necessary, by authorized translators, to intercept and to record wire communications of the TARGET SUBJECTS over the TARGET CELLPHONE until such wire communications are intercepted that fully reveal: (i) the plans and methods of operation of the TARGET SUBJECTS as they participate in the TARGET OFFENSES; (ii) the nature and extent of the TARGET SUBJECTS' participation in the TARGET OFFENSES; (iii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iv) the locations and items used by the TARGET SUBJECTS in furtherance of their commission of the TARGET OFFENSES; (v) the existence and locations of records that relate to the TARGET OFFENSES; and (vi) the sources of resources used by the TARGET SUBJECTS to finance their illegal activities -- or for a period of thirty (30) days, whichever is earlier.

IT IS FURTHER REQUESTED, because of the mobility of portable cellular telephones and beepers, that the Order

41

authorize the interception of wire communications within the
Southern District of New York, and outside that jurisdiction but
within the United States, pursuant to Section 2518(3) of Title
18, United States Code.  In addition, it is requested that the
Order authorize the interception of background conversations in
the vicinity of the TARGET CELLPHONE while the telephone is off
the hook or otherwise not in use.

     IT IS FURTHER REQUESTED that the Order apply not only
to the TARGET CELLPHONE, but also to any telephone numbers
subsequently assigned to or accessed by or through the same IMSI
as the TARGET CELLPHONE, as well as any IMSI subsequently
assigned to the instrument bearing the same telephone number
assigned to the TARGET CELLPHONE.

     IT IS FURTHER REQUESTED that the Order require its
execution as soon as practicable after it is signed and that
interceptions shall be conducted in such a way as to minimize the
interception of wire communications not otherwise subject to
interception under Chapter 119 of Title 18, United States Code,
and must terminate upon attainment of the authorized objectives,
or in any event, at the end of thirty (30) days.  If an
interception is minimized, agents shall spot check to insure that
the conversation has not turned to criminal matters.  The 30-day
period shall be measured from the earlier of the day on which the

7

42

FBI first begins to conduct an interception under the Order or ten days after the Order is granted, whichever comes first.

IT IS FURTHER REQUESTED that the Order require Sprint/Nextel Corporation (the service provider for the TARGET CELLPHONE) to furnish the applicant forthwith all information, facilities and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that each provider is according the persons whose communications are to be intercepted (including all dial digits (including all incoming and outgoing calls), pen register information, and audio interception capability (whether the cellular telephone is in roaming mode or otherwise), the furnishing of such facilities or technical assistance by Sprint/Nextel Corporation to be compensated by the FBI for reasonable expenses incurred; and

IT IS FURTHER REQUESTED that the Order require that the information to be provided by Sprint/Nextel Corporation shall include, but not be limited to, services such as hunting for rotary numbers associated with the above numbers, call forwarding, speed dialing, call waiting, three-way calling, and all services for intercepted numbers, and that, pursuant to 18 U.S.C. 2703(d), upon request of the applicant pursuant to 18 U.S.C. 2703(c)(1)(B), Sprint/Nextel shall supply the applicant and the FBI upon request with subscriber information for both

8

43

published and non-published telephone numbers, which may be
requested in furtherance of this investigation, because the
contents of the information sought is relevant and material to an
ongoing criminal investigation; and

IT IS FURTHER REQUESTED that, pursuant to Federal Rule
of Criminal Procedure 41, the Order require Sprint/Nextel to
initiate a signal to determine the location of the subject's
mobile device on the service provider's network or with such
other reference points as may be reasonably available and at such
intervals and times as directed by the law enforcement agent
serving this order.

IT IS FURTHER REQUESTED that the Order indicate that
interception by the FBI is permitted over the TARGET CELLPHONE of
"point-to-point" or "Direct Connect" communications between the
TARGET CELLPHONE and other devices with compatible features, in
addition to communications over the cellular telephone network
used by the TARGET CELLPHONE; and

IT IS FURTHER REQUESTED that the Order  direct
Sprint/Nextel, as well as Sprint PCS, Sprint Spectrum PCS, Sprint
Spectrum LP, T-Mobile USA, Verizon New York, Inc., Verizon New
Jersey, Inc., AT&T, AT&T Wireless, Verizon Wireless, MCI
Telecommunications Corp., MCI WorldCom, Cingular Wireless, and
any other electronic communication service provider be ordered to
expeditiously disclose all subscriber information, including

9

44

name, address, local and long distance telephone toll billing records, telephone number or other subscriber number or identity, length of service, and types of services, for all telephone numbers, published and non-published, derived from the wire intercept

IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. §§ 3121-26 and 2703(d), the Order authorize the disclosure of originating and terminating cell site location information (specifically, information which identifies the antenna tower receiving transmissions from the TARGET CELLPHONE and any information on what portion of that tower is receiving a transmission, if available) at the beginning and end of a particular telephone call made or received by the user of the TARGET CELLPHONE, which information is to be transmitted from the service provider for the TARGET CELLPHONE to the FBI and other law enforcement agencies for all calls made to or from the TARGET CELLPHONE during the period of interception; and

IT IS FURTHER REQUESTED that, to avoid prejudice to this criminal investigation, Sprint/Nextel Corporation and its agents and employees shall not disclose or cause the disclosure of the Order or the interception that it authorizes to any person other than those of its agents and employees who require said information to accomplish the interception of communications hereby ordered, and that, in particular, Sprint/Nextel

10

Corporation and its agents and employees shall in no event make such disclosure to the telephone user involved, or to any actual or potential interceptee.

IT IS FURTHER REQUESTED that Assistant United States Attorney Michael Farbiarz or any other Assistant United States Attorney familiar with the facts of this case be ordered to cause to be provided to the Court a report on or about the tenth, twentieth, and thirtieth days following the date of the Order or the date interception begins, whichever is later, showing what progress has been made toward the achievement of the authorized objectives and the need for continued interception, except that, if application is made to extend this Order, such renewal application shall constitute the thirtieth day report.  If any such reports become due on weekends or holidays, they should become due on or about the next business day thereafter.

IT IS FURTHER REQUESTED that no inventory or return of the results of the foregoing wire surveillance and interception need be made, other than the above-required reports, before 90 days from the date of the expiration of the Order, or any extension of the Order, or at such time as the Court in its discretion may require.

IT IS FURTHER REQUESTED that, upon an ex parte showing of good cause to a judge of competent jurisdiction, the service

11

46

of the above inventory or return may be postponed for a further reasonable period of time.

IT IS FURTHER REQUESTED that, after reading this application and its supporting papers, the Court seal this application, the supporting affidavit of Supervisory Special Agent Rossanova, and the Court's Orders authorizing the interception of wire communications, and place those documents in the custody of the United States Attorney's Office for the Southern District of New York until they are ordered unsealed by the Court or by another Judge of competent jurisdiction, except that copies of this Order shall be served on the FBI and other participants in the investigation as necessary to effectuate this Order.

MICHAEL FARBIARZ
Assistant United States Attorney
Southern District of New York
Tel. Number:  (212) 637-1587


Sworn to before me this
20th day of June 2007

UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

12

47



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 2, 2007

<u>TO BE FILED</u>
<u>UNDER SEAL</u>

<u>BY HAND</u>

The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

> <u>Re:</u>  <u>First Periodic Report Pursuant to</u>
> <u>The Court's Order of June 20, 2007,</u>
> <u>Authorizing the Interception of</u>
> <u>Wire Communications</u>

Dear Judge Hellerstein:

This report is submitted pursuant to the Court's Order, signed June 20, 2007 (the "June 20, 2007 Order") authorizing the interception of wire communications occurring over the cellular telephone assigned call number (347) 680-7262, with International Mobile Subscriber Information ("IMSI") number 316010160198103, and Universal Fleet Mobile Identification ("UFMI") number 176*887*8959, a cellular telephone with subscriber information of GSD LML, 98 Post Avenue, New York, New York, with service provided by Sprint/Nextel Corporation (the "TARGET CELLPHONE"), and any telephone numbers subsequently assigned to the instruments bearing the same IMSI number as the TARGET CELLPHONE, as well as any IMSI number subsequently assigned to the instrument bearing the same telephone number assigned to either of the TARGET CELLPHONE.

With regard to the June 20, 2007 Order, the tenth day was June 30, 2007. As that day was a Saturday, the required ten-day report is being provided to the Court today.

Instructions regarding minimization — the substance of which was explained, in person and before the monitoring began,

113

Honorable Alvin K. Hellerstein
July 2, 2007
Page 2

by Assistant United States Attorney Michael Farbiarz to agents of
the Federal Bureau of Investigation ("FBI"), other law
enforcement officers, and translators assigned to assist the FBI
in connection with this case — were provided to these persons and
posted in the monitoring plant.  Monitoring of the TARGET
CELLPHONE began June 20, 2007, and is ongoing as of the date of
this report.

### Description of Selected Communications
### Intercepted Over the TARGET CELLPHONE

            Interception of communications over TARGET CELLPHONE
from June 20, 2007 up to and including July 1, 2007, have
confirmed that the TARGET CELLPHONE is being consistently used by
the TARGET SUBJECT, ALEXANDER CONCEPCION.

            Set forth below are summaries of some of what appear to
be pertinent conversations intercepted over the TARGET CELLPHONE
during the period from June 20, 2007 up to and including July 1,
2007.  The summaries listed below do not, however, constitute a
complete list of the pertinent conversations.  The following
descriptions are based upon my review of the line sheets, my
review of summaries of certain of the calls completed by the
monitoring agents, and discussions with the supervising agents.[1]
Many of the intercepted conversations have been in Spanish.
These conversations are the product of preliminary translation
and are subject to further revision.

**June 22, 2007**

            On or about June 22, 2007, at approximately 9:50 p.m.,
ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a
telephone call to a male who has not yet been identified ("U/M
#1").  During the referenced call, U/M #1 told CONCEPCION that he
knows a man who can obtain for him (U/M #1) a "Mossberg," the
"shit that the SWAT team be using."

            Based on their training and experience, their
participation in this investigation, and their review of other
intercepted communications, the monitoring agents believe that,
in this conversation, U/M #1 and CONCEPCION were talking about a
connection that U/M #1 has to an individual who can get for U/M #
1 a substantial weapon — such as a shotgun or high-powered rifle

---

        [1]  Copies of the summary log sheets are available for the
Court's review upon request.

Honorable Alvin K. Hellerstein
July 2, 2007
Page 3

of the kind manufactured by O.F. Mossberg & Son and often used by special police squads.

### June 27, 2007

On or about June 27, 2007, at approximately 7:17 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a telephone call to a male who has not yet been identified ("U/M #2"). During the referenced call, U/M #2 told CONCEPCION that he has a "big one," which U/M # 2 described as a nine millimeter with a scope; CONCEPCION asked as to the price of the "big one," and U/M # 2 responded by stating that he wanted something up front.

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, U/M # 2 and CONCEPCION were talking about CONCEPCION buying from U/M #2 a sophisticated weapon — a nine millimeter rifle, equipped with a scope for ease in spotting and hitting targets. The discussion focused, in part, on the possibility of CONCEPCION paying for the weapon by putting some money down up-front, and then paying fully for the weapon later.

### Other Calls

In addition to the calls described above, the monitoring agents have intercepted, among other pertinent calls, a number of calls that may be calls in which ALEXANDER CONCEPCION is arranging a narcotics transaction or transactions. These calls, along with the ones set forth above, are very much pertinent here. As interpreted by the monitoring agents in light of their training and experience, and their review of other intercepted communications, these calls shed light on the identities of the criminal associates of CONCEPCION; on where CONCEPCION and his associates seek securely to stash contraband; and on how CONCEPCION and his associates earn money, which money may be used for a number of illicit purposes, including in furtherance of the TARGET OFFENSES here.

For example, on or about June 27, 2007, at approximately 6:43 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a telephone call to a male who has not yet been identified ("U/M #3"), but who may go by the name "G." During the referenced call, CONCEPCION told U/M #3 that he has "two" ready; U/M # 3 responded by indicating that he was fixing the car and was nearly ready to go. U/M #3 suggested that they (U/M #3

Honorable Alvin K. Hellerstein
July 2, 2007
Page 4

and CONCEPCION) could stash everything near CONCEPCION's house and that, if CONCEPCION preferred, he (CONCEPCION) could cover his face while undertaking the transaction in question.

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, U/M # 3 and CONCEPCION were talking about CONCEPCION selling narcotics in an especially stealthy fashion (possibly with his face covered) — and secreting the narcotics in the "trap" of a vehicle (which needed to be fixed) and then at a location near CONCEPCION's house.

## Need for Continued Interception

The Government submits that the foregoing pertinent calls demonstrate that progress is being made toward the achievement of the authorized objectives of the interception order.

The Government submits that continued interception of wire communications occurring over the TARGET CELLPHONE is necessary to assist in revealing: (i) the plans and methods of operation of the TARGET SUBJECTS as they participate in the TARGET OFFENSES; (ii) the nature and extent of the TARGET SUBJECTS' participation in the TARGET OFFENSES; (iii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iv) the locations and items used by the TARGET SUBJECTS in furtherance of their commission of the TARGET OFFENSES; (v) the existence and locations of records that relate to the TARGET OFFENSES; and (vi) the sources of resources used by the TARGET SUBJECTS to finance their illegal activities.

Although interceptions to date appear to be useful in helping to determine this information, at present the objectives have not yet been fully achieved. Continued interceptions will be useful in furthering the objectives of the investigation. Based upon the above, we expect to continue monitoring the TARGET CELLPHONES for the remainder of the thirty-day period authorized by the Court's June 20, 2007 Order. The Court will be duly advised concerning further interceptions and monitoring in subsequent periodic reports.

Finally, the Government respectfully requests that, with the exception of working copies for the Government, this letter be sealed, impounded, and held in the custody of the

Honorable Alvin K. Hellerstein
July 2, 2007
Page 5

United States Attorney's Office for the Southern District of New
York until further order of the Court.  To this end, I am
enclosing two originals of this letter, as well as a sealing
envelope.

I can be reached at the number listed below if the
Court has any questions, and to arrange for this letter to be
picked up after it has been received and reviewed.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:  _____

Michael Farbiarz
Assistant United States Attorney
(212) 637-1587

RECEIVED AND REVIEWED:

_____
HONORABLE ALVIN K. HELLERSTEIN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

July 2 2007; 4:40 pm
Date/Time

117

... 



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 10, 2007

<u>TO BE FILED</u>
<u>UNDER SEAL</u>

<u>BY HAND</u>

The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

<u>Re:</u>  <u>Second Periodic Report Pursuant to</u>
<u>The Court's Order of June 20, 2007,</u>
<u>Authorizing the Interception of</u>
<u>Wire Communications</u>

Dear Judge Hellerstein:

This report is submitted pursuant to the Court's Order, signed June 20, 2007 (the "June 20, 2007 Order") authorizing the interception of wire communications occurring over the cellular telephone assigned call number (347) 680-7262, with International Mobile Subscriber Information ("IMSI") number 316010160198103, and Universal Fleet Mobile Identification ("UFMI") number 176*887*8959, a cellular telephone with subscriber information of GSD LML, 98 Post Avenue, New York, New York, with service provided by Sprint/Nextel Corporation (the "TARGET CELLPHONE"), and any telephone numbers subsequently assigned to the instruments bearing the same IMSI number as the TARGET CELLPHONE, as well as any IMSI number subsequently assigned to the instrument bearing the same telephone number assigned to either of the TARGET CELLPHONE.

Instructions regarding minimization — the substance of which was explained, in person and before the monitoring began, by Assistant United States Attorney Michael Farbiarz to agents of the Federal Bureau of Investigation ("FBI"), other law enforcement officers, and translators assigned to assist the FBI in connection with this case — were provided to these persons and

118

Honorable Alvin K. Hellerstein
July 10, 2007
Page 2

posted in the monitoring plant.  Monitoring of the TARGET
CELLPHONE began June 20, 2007, and is ongoing as of the date of
this report.

## Description of Selected Communications
## Intercepted Over the TARGET CELLPHONE

Interception of communications over TARGET CELLPHONE
from June 20, 2007 up to and including July 10, 2007, have
confirmed that the TARGET CELLPHONE is being consistently used by
the TARGET SUBJECT, ALEXANDER CONCEPCION.

Set forth below are summaries of some of what appear to
be pertinent conversations intercepted over the TARGET CELLPHONE
during the period from July 1, 2007 up to and including July 10,
2007.  The summaries listed below do not, however, constitute a
complete list of the pertinent conversations.  The following
descriptions are based upon my review of the line sheets, my
review of summaries of certain of the calls completed by the
monitoring agents, and discussions with the supervising agents.[1]
Many of the intercepted conversations have been in Spanish.
These conversations are the product of preliminary translation
and are subject to further revision.

### July 6, 2007

On or about July 6, 2007, at approximately 4:01 p.m.,
ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a
telephone call to a male who has not yet been identified ("U/M
#1").  During the referenced call, CONCEPCION told U/M #1 that
"they" showed him (CONCEPCION) a "45" and a "38."  CONCEPCION
stated that he would go pick it up, but that it does not have
"rocks"; UM #1 said that he would work on getting "rocks."

Based on their training and experience, their
participation in this investigation, and their review of other
intercepted communications, the monitoring agents believe that,
in this conversation, U/M #1 and CONCEPCION were talking about
CONCEPCION seeking to obtain a weapon (a .45 or .38 caliber
pistol), as well as some bullets ("rocks").

---

[1]    Copies of the summary log sheets are available for the
Court's review upon request.

Honorable Alvin K. Hellerstein
July 10, 2007
Page 3

### Other Calls

In addition to the calls described above, the monitoring agents have intercepted, among other pertinent calls, a number of calls that may be calls in which ALEXANDER CONCEPCION is arranging or participating in a narcotics transaction or transactions. These calls, along with the ones set forth above, are very much pertinent here. As interpreted by the monitoring agents in light of their training and experience, and their review of other intercepted communications, these calls shed light on the identities of the criminal associates of CONCEPCION; on where CONCEPCION and his associates seek securely to stash contraband; and on how CONCEPCION and his associates earn money, which money may be used for a number of illicit purposes, including in furtherance of the TARGET OFFENSES here.

For example, on or about July 7, 2007, at approximately 12:54 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a telephone call from a male who has not yet been identified, but who may be U/M #1. During the referenced call, U/M #1 asked CONCEPCION if he (CONCEPCION) had a "picture" of some hair "grease"; U/M #1 further stated that he wanted to show a "picture" to his friends, and was not sure how much they wanted.

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, U/M # 1 was requesting from CONCEPCION a sample ("picture") of narcotics that he (U/M #1) could show to his associates, so that they could determine how much to purchase in the way of narcotics.

To cite another example, on or about July 7, 2007, at approximately 5:59 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a telephone call to a male who has not yet been identified, but who may be U/M #1. During the referenced call, U/M #1 and CONCEPCION discussed money that U/M #1 was said to owe CONCEPCION for two "ounce[s]." Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, U/M # 1 and CONCEPCION were discussing a narcotics debt U/M #1 owed to CONCEPCION.

### Need for Continued Interception

Honorable Alvin K. Hellerstein
July 10, 2007
Page 4

The Government submits that the foregoing pertinent calls demonstrate that progress is being made toward the achievement of the authorized objectives of the interception order.

The Government submits that continued interception of wire communications occurring over the TARGET CELLPHONE is necessary to assist in revealing: (i) the plans and methods of operation of the TARGET SUBJECTS as they participate in the TARGET OFFENSES; (ii) the nature and extent of the TARGET SUBJECTS' participation in the TARGET OFFENSES; (iii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iv) the locations and items used by the TARGET SUBJECTS in furtherance of their commission of the TARGET OFFENSES; (v) the existence and locations of records that relate to the TARGET OFFENSES; and (vi) the sources of resources used by the TARGET SUBJECTS to finance their illegal activities.

Although interceptions to date appear to be useful in helping to determine this information, at present the objectives have not yet been fully achieved. Continued interceptions will be useful in furthering the objectives of the investigation. Based upon the above, we expect to continue monitoring the TARGET CELLPHONES for the remainder of the thirty-day period authorized by the Court's June 20, 2007 Order. The Court will be duly advised concerning further interceptions and monitoring in subsequent periodic reports.

Finally, the Government respectfully requests that, with the exception of working copies for the Government, this letter be sealed, impounded, and held in the custody of the United States Attorney's Office for the Southern District of New York until further order of the Court. To this end, I am enclosing two originals of this letter, as well as a sealing envelope.

I can be reached at the number listed below if the

Honorable Alvin K. Hellerstein
July 10, 2007
Page 5

Court has any questions, and to arrange for this letter to be
picked up after it has been received and reviewed.

                              Respectfully submitted,

                              MICHAEL J. GARCIA
                              United States Attorney

                    By:    _____
                              Michael Farbiarz
                              Assistant United States Attorney
                              (212) 637-1587

RECEIVED AND REVIEWED:

_____        _____
HONORABLE ALVIN K. HELLERSTEIN SIDNEY H STEIN    Date/Time
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 20, 2007

<u>TO BE IMPUNDED</u>
<u>UNDER SEAL</u>

<u>BY HAND</u>

The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:   **Final Periodic Report Pursuant to June 20,**
> **2007 Order Authorizing Interception of Wire**
> <u>**Communications Over Cellular Telephone**</u>

Dear Judge Hellerstein:

This report is submitted pursuant to the Court's Order, signed June 20, 2007 (the "June 20, 2007 Order") authorizing the interception of wire communications occurring over the cellular telephone assigned call number (347) 680-7262, with International Mobile Subscriber Information ("IMSI") number 316010160198103, and Universal Fleet Mobile Identification ("UFMI") number 176*887*8959, a cellular telephone with subscriber information of GSD LML, 98 Post Avenue, New York, New York, with service provided by Sprint/Nextel Corporation (the "TARGET CELLPHONE"), and any telephone numbers subsequently assigned to the instruments bearing the same IMSI number as the TARGET CELLPHONE, as well as any IMSI number subsequently assigned to the instrument bearing the same telephone number assigned to either of the TARGET CELLPHONE.

Instructions regarding minimization – the substance of which was explained, in person and before the monitoring began, by Assistant United States Attorney Michael Farbiarz to agents of the Federal Bureau of Investigation ("FBI"), other law enforcement officers, and translators assigned to assist the FBI in connection with this case – were provided to these persons and posted in the monitoring plant. Monitoring of the TARGET

130

Honorable Alvin K. Hellerstein
July 20, 2007
Page 2

CELLPHONE began June 20, 2007, and was terminated on July 19, 2007.

**Overview and Summary of
the TARGET CELLPHONE Calls**

      Interception of communications over TARGET CELLPHONE from June 20, 2007 up to and including July 19, 2007, have confirmed that the TARGET CELLPHONE is being consistently used by the TARGET SUBJECT, ALEXANDER CONCEPCION.  For the Court's information, based on information provided to me by Special Agents of the FBI, the following is a statistical summary of the telephone activity over TARGET CELLPHONE for the Covered Period:

| Date | Total Intercepted Calls[1] | Number of Calls Flagged as Pertinent[2] | Calls Over 2 Minutes[3] | Minimized Calls[4] |
|------|------|------|------|------|
| 7/10/07 - 7/19/07 | 3490 | 306 | 50 | 11 |

---

    [1]  The term "intercepted calls" includes, for purposes of this report, all incomplete calls (*i.e.*, unanswered calls, busy signals, mis-dialed calls, and instances where the caller simply takes the telephone off the hook and then hangs up without dialing), as well as completed calls, and it includes calls made at times when monitoring was not occurring, such as during certain portions of the night.

    [2]  This column identifies the number of interceptions that, from the content of the conversation, the agents have preliminarily designated as relevant to the ongoing investigation as authorized by the Court.  Because these designations are preliminary, however, later investigation may cause the agents to change their interpretations as to whether the calls are relevant, and thus, the Government reserves the right to reconsider these designations at a later date.

    [3]  "Calls over two Minutes" includes all completed calls lasting more than two minutes.

    [4]  "Minimized Calls" means actual conversations in which minimization occurred.

Honorable Alvin K. Hellerstein
July 20, 2007
Page 3

        Set forth below are summaries of some of what appear to
be pertinent conversations intercepted over the TARGET CELLPHONE
during the period from July 10, 2007 up to and including July 19,
2007.  The summaries listed below do not, however, constitute a
complete list of the pertinent conversations.  The following
descriptions are based upon my review of the line sheets, my
review of summaries of certain of the calls completed by the
monitoring agents, and discussions with the supervising agents.[5]
Many of the intercepted conversations have been in Spanish.
These conversations are the product of preliminary translation
and are subject to further revision.

        **July 11, 2007**

        On or about July 11, 2007, at approximately 11:45 p.m.,
ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a
telephone call to an unidentifed male ("U/M #5").  U/M #5 told
CONCEPCION that he has a "guy inside . . . helping us [who will]
open the door."  He also stated that there were "4 niggers, 2
things.  So you have to be prepared."  U/M #1 also stated that
"we haven't done it yet because we haven't found a toy that we're
comfortable with, unless you can do it with a .22."  CONCEPCION
stated that "tomorrow I'm going to introduce you to a guy who can
get you a toy for $500."

        Based on their training and experience, their
participation in this investigation, and their review of other
intercepted communications, the monitoring agents believe that,
in this conversation, ALEXANDER CONCEPCION and U/M #5 were
planning a home invasion robbery of a drug dealer.  In the
initial part of the call, they were discussing the robbery of 2
pounds of marijuana from four individuals.  U/M #5 indicated that
a person on the inside would help the crew get into the apartment
to facilitate the robbery.  The latter part of the call, they
were discussing the weapons that would be needed to do the
robbery.  Finally, CONCEPCION proposed introducing U/M #5 to
someone who can sell him a gun for the robbery for $500.

        **July 15, 2007**

        On or about July 15, 2007, at approximately 3:44 p.m.,
ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a
telephone call to a male identified as "Bienve."  During the

_____

        [5]  Copies of the summary log sheets are available for the
Court's review upon request.

Honorable Alvin K. Hellerstein
July 20, 2007
Page 4

referenced call, CONCEPCION asked "Bienve" for "three kilos" and
Bienve replied that he would give CONCEPCION each kilo for "17."

Based on their training and experience, their
participation in this investigation, and their review of other
intercepted communications, the monitoring agents believe that,
in this conversation, ALEXANDER CONCEPCION and "Bienve" were
discussing a narcotics transaction for three kilograms of cocaine
and that Bienve was quoting a price of $17,000 per kilogram.

On or about July 15, 2007, at approximately 3:45 p.m.,
ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a
telephone call from a male who has not yet been identified ("U/M
#6").  During the referenced call, CONCEPCION asked U/M #6 if he
(U/M #6) would be bringing the "three kilos."

Based on their training and experience, their
participation in this investigation, and their review of other
intercepted communications, the monitoring agents believe that,
in this conversation, ALEXANDER CONCEPCION and U/M #2 were
discussing the delivery of three kilograms of cocaine.

**July 16, 2007**

On or about July 16, 2007, at approximately 9:27 p.m.,
ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a
telephone call from a male who has been identified as "Johnny
Santana."  CONCEPCION told "Johnny Santana" that he was looking
for one kilo for "Black."

Based on their training and experience, their
participation in this investigation, and their review of other
intercepted communications, the monitoring agents believe that,
in this conversation, ALEXANDER CONCEPCION and "Johnny Santana"
were discussing the purchase of one kilogram of cocaine.

**July 17, 2007**

On or about July 17, 2007, at approximately 11:27 p.m.,
ALEXANDER CONCEPCION, using the TARGET CELLPHONE, recieved a
telephone call to a male identified as "Johnny Santana."
CONCEPCION told "Johnny Santana" "that shit's not going down
today.  It's going to go down tomorrow.  The man is cold.  I
spoke to him.  That weed that he has is not that good.  I want to
wait until he has some good piff."

133

Honorable Alvin K. Hellerstein
July 20, 2007
Page 5

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, ALEXANDER CONCEPCION and "Johnny Santana" were discussing the reasons for delaying a home invasion robbery of a drug dealer for one day.  When CONCEPCION stated that the dealer is "cold" he meant that the drugs he had were not worth doing the robbery.

## **Conclusion**

Monitoring of the TARGET CELLPHONE was terminated on July 19, 2007.  The Government submits that the foregoing demonstrates that progress was made toward the achievement of the authorized objectives of the interception order. The Government submits, however, that the wire intercepts and other investigation to date still have not accomplished the authorized objectives.  The Government intends to seek authorization immediately to resume wire interceptions on the TARGET CELLPHONE.

The Government respectfully requests that, with the exception of working copies for the Government, this letter be sealed, impounded and held in the custody of the United States Attorney's Office for the Southern District of New York until further Order of the Court.

Honorable Alvin K. Hellerstein
July 20, 2007
Page 6

      For the Court's convenience, a sealing envelope is enclosed. Your Honor is requested to sign two copies of this report, place one copy in the sealed envelope and return both the sealed envelope and the additional copy to my attention.

                  Respectfully submitted,

                  MICHAEL J. GARCIA
                  United States Attorney

By: 

                  John T. Zach
                  William J. Harrington
                  Assistant United States Attorneys
                  (212) 637-2410/2331

RECEIVED AND REVIEWED:

HONORABLE ALVIN K. HELLERSTEIN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

                                7-23-07·5⁵⁰ pm
                                  Date/Time

135

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING OVER: A SPRINT CELLULAR TELEPHONE BEARING ASSIGNED CALL NUMBER 347-680-7262, AND BEARING IMSI 316010160198103, AND UFMI 176*887*8959 ("TARGET CELLPHONE") | APPLICATION FOR ORDER AUTHORIZING THE INTERCEPTION OF WIRE COMMUNICATIONS OVER A CELLULAR TELEPHONE |

STATE OF NEW YORK            )
COUNTY OF NEW YORK           :    ss.:
SOUTHERN DISTRICT OF NEW YORK )

     WILLIAM J. HARRINGTON, an Assistant United States Attorney in the Southern District of New York, being duly sworn, states:

     1.    I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18 of the United States Code — that is, an attorney authorized by law to prosecute or participate in the prosecution of offenses enumerated in Section 2516 of Title 18 of the United States Code.

     2.    Pursuant to the authority vested in him by Section 2516 of Title 18 of the United States Code, by Order Number 2758-2005 of February 24, 2005, the Attorney General of the United States has specially designated appropriate officials of the Criminal Division to exercise the power conferred on him by Section 2516 of Title 18 of the United States Code to authorize applications for a court order authorizing the interception of wire communications. Under the power delegated by special designation of the Attorney General, an appropriately designated

official in the Criminal Division has authorized this
application.  A copy of that official's memorandum authorizing
this application, as well as a copy of the Attorney General's
Order designating that official, are attached to this application
as Exhibit A.

3.    This application is for an order, pursuant to
Section 2518 of Title 18 of the United States Code, authorizing
the interception and recording of wire communications of
ALEXANDER CONCEPCION, a/k/a "Alex Concepcion," FNU LNU, a/k/a
"Johnny Santana," FNU LNU, a/k/a "G," FNU LNU, a/k/a "Bienve,"
and others known and unknown (collectively the "TARGET
SUBJECTS"), occurring over a cellular telephone assigned call
number (347) 680-7262 with International Mobile Subscriber
Information ("IMSI") number 316010160198103, and Universal Fleet
Mobile Identification ("UFMI") number 176*887*8959, which has
service provided by Sprint/Nextel Corporation and subscriber
information of GSD LML, 98 Post Avenue, New York, New York (the
"TARGET CELLPHONE"); and any telephone numbers subsequently
assigned to or accessed by or through the same IMSI or UFMI
number as the TARGET CELLPHONE, or assigned to the instrument
bearing the same IMSI or UFMI number as the TARGET CELLPHONE, as
well as any IMSI or UFMI number subsequently assigned to the
instrument bearing the same telephone number assigned to the
TARGET CELLPHONE.

-2-

139

4.    I have discussed the circumstances of the above
investigation with Special Agent Eric M. Paholsky of the Federal
Bureau of Investigation ("FBI"), who is presently assigned to
Group C-36, Gangs, Criminal Enterprises and Drugs, and who has
participated in the investigation herein; I have examined Special
Agent Paholsky's affidavit submitted in support of this
application (attached to this application as Exhibit B and
incorporated by reference herein); and I therefore state, upon
information and belief, that:

### Subjects and Offenses

(a)    There is probable cause to believe that the
TARGET SUBJECTS have committed, are committing, and will continue
to commit the following offenses: (1) the importation of,
distribution of, and possession with intent to distribute of,
controlled substances, the use of wire facilities to facilitate
the same, conspiracy to do the same and attempts to do the same,
in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960 and 963
and 18 U.S.C. § 924(g) (the "TARGET OFFENSES").

### Designated Target Cellphone

(b)    There is probable cause to believe that
certain of the TARGET SUBJECTS, during the period of interception
applied for herein, will use the TARGET CELLPHONE in furtherance
of, in connection with, to facilitate, to accomplish, and to
commit the above-described offenses.

-3-

140

## Objectives

(c)   There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will help to reveal: (i) the nature, extent and methods of operation of the narcotics activities of the TARGET SUBJECTS; (ii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the source, receipt, and distribution of narcotics activities, contraband, and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance their illegal activities; and (vii) the locations and disposition of the proceeds from and relating to those activities.   In addition, these wire communications are expected to constitute admissible evidence of the commission of the above-described offenses.

## Other Investigative Procedures

(d)   As set forth more fully in Exhibit B, normal investigative techniques have been tried and have failed or reasonably appear unlikely to succeed if tried.

## Prior Applications

(e)   I have been informed that reviews have been done of the wire and electronic surveillance files of the DEA,

-4-

141

the FBI and BICE.[1]  Based on that review, I have been informed
that there have been no prior applications for court
authorization to intercept, or approval of interception of, wire,
oral, or electronic communications of the TARGET CELLPHONE or the
TARGET SUBJECTS except as set forth in Exhibit B.

WHEREFORE, I believe that probable cause exists to
believe that the TARGET SUBJECTS, during the period of
interception applied for herein, will use the TARGET CELLPHONE to
communicate with each other and others as yet unknown, in
connection with the commission of the above-described offenses.
I further believe that, if the interception herein applied for is
authorized by this Court, wire communications of the TARGET
SUBJECTS concerning those offenses will be intercepted.

On the basis of the allegations contained in this
application and on the basis of the attached affidavit of Special
Agent Eric M. Paholsky:

IT IS HEREBY REQUESTED that this Court issue an order,
pursuant to the power conferred on it by Section 2518 of Title 18
of the United States Code, authorizing special agents of the FBI
and other investigative and law enforcement officers, assisted,
if necessary, by authorized translators, to intercept and to
record wire communications of the TARGET SUBJECTS over the TARGET

_____

[1]    A check of FBI, DEA and BICE files was completed on or
about June 11, 2007.

CELLPHONE until such communications are intercepted that fully reveal (i) the nature, extent, and methods of operation of the narcotics business and activities of the TARGET SUBJECTS; (ii) the identities and roles of accomplices, aiders and abettors, co-conspirators, and other participants in their illegal activities; (iii) the receipt and distribution of contraband and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance their illegal activities; and (vii) the locations and dispositions of proceeds from those activities — or for a period of thirty (30) days, whichever is earlier.

IT IS FURTHER REQUESTED that the order require its execution as soon as practicable after it is signed, and that interception be conducted in such a way as to minimize the interception of wire communications not otherwise subject to interception under Chapter 119 of Title 18 of the United States Code and terminate upon attainment of the authorized objectives, or, in any event, at the end of thirty (30) days. If the conversation is minimized, agents will spot check to ensure that the conversation has not turned to criminal matters. The 30 days is to be measured from the earlier of the date on which investigative or law enforcement officers first begin to conduct

-6-

143

interception under this Court's order or ten days from the date of this Court's order.

Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined that the conversation is criminal in nature. If a conversation is minimized, monitoring agents may spot check to ensure that the conversation has not turned to criminal matters. It is further requested, pursuant to Section 2518(5) of Title 18 of the United States Code, that, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

IT IS FURTHER REQUESTED, pursuant to the provisions of Title 18, United States Code, Sections 2518(4), that it be ordered that Sprint, the service provider for the TARGET CELLPHONE, and any other service provider for the TARGET CELLPHONE, furnish the technical assistance necessary to

-7-

accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all dial digits, including all incoming and outgoing calls and pen register information, pursuant to 18 U.S.C. § 3121, et seq., and audio interception capability whether the cellular telephone is in roaming mode or otherwise). It is further requested that Sprint, the service provider, and any other service provider for the TARGET CELLPHONE, maintain service to the TARGET CELLPHONE for the period of interception and any extensions thereto. The assistance of this provider is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by the FBI.

IT IS FURTHER REQUESTED, because the need for contemporaneous information concerning the intercepted communications is especially important in the present investigation, that Sprint, and any other service provider for the TARGET CELLPHONE, be ordered, under 18 U.S.C. § 2703, to provide originating and terminating cell site information for the intercepted wire communications over the TARGET CELLPHONE, by permitting access to such information.

IT IS FURTHER REQUESTED that Sprint, and any other service provider for the TARGET CELLPHONE, shall disclose to the

-8-

145

United States and the FBI, all published and non-published subscriber information and toll records and information relevant to this investigation, that is, all such information pertaining to the telephone numbers associated with telephones, digital display devices, and mobile telephones used, if any, which may be requested in furtherance of this investigation, within twenty-four hours of said request, there being reason to believe that the contents of the information sought are relevant to a legitimate law enforcement inquiry.

IT IS FURTHER REQUESTED that any tracing operation and the use of Caller ID service for the TARGET CELLPHONE be without geographical limit.

IT IS FURTHER REQUESTED that interception be permitted over any telephone numbers subsequently assigned to the instruments bearing the same IMSI or UFMI numbers as the TARGET CELLPHONE, as well as any IMSI or UFMI numbers subsequently assigned to the instruments bearing the same telephone number assigned to the TARGET CELLPHONE.

IT IS FURTHER REQUESTED that if the TARGET CELLPHONE is transferred outside the jurisdiction of this Court, such interception may take place in any other jurisdiction within the United States.

IT IS FURTHER REQUESTED that this application, as it reveals an ongoing investigation, be sealed until further order

-9-

146

of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

WILLIAM J. HARRINGTON
Assistant United States Attorney
Southern District of New York
(212) 637-2331


Sworn to before me this
20th day of July 2007


THE HONORABLE VICTOR MARRERO
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

-10-

147

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR AUTHORIZATION TO INTERCEPT WIRE
COMMUNICATIONS OCCURRING OVER: A
SPRINT CELLULAR TELEPHONE BEARING
ASSIGNED CALL NUMBER 347-680-7262,
AND BEARING IMSI 316010160198103,
AND UFMI 176*887*8959 ("TARGET
CELLPHONE")

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
CONTINUED AUTHORIZATION
TO INTERCEPT WIRE
COMMUNICATIONS

STATE OF NEW YORK            )
COUNTY OF NEW YORK           ) ss.:
SOUTHERN DISTRICT OF NEW YORK )

      ERIC M. PAHOLSKY, a special agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, deposes and states:

## INTRODUCTION

      1.   I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516, Title 18, United States Code. I have been an FBI agent for approximately three and half years.  I am a member of Group C-36, Gangs, Criminal Enterprises and Drugs.  I have participated in numerous investigations of unlawful drug trafficking and money laundering and, among other things, have conducted or participated in surveillances, the execution of search warrants, debriefings of informants and reviews of taped conversations and

drug records.  Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs and the laundering of narcotics proceeds.

2.    I submit this affidavit in support of an application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the continued interception and recording of wire communications concerning offenses enumerated in Section 2516 of Title 18, United States Code -- that is, offenses involving the importation of, distribution of, and possession with intent to distribute of, controlled substances, the use of wire facilities to facilitate the same, conspiracy to do the same and attempts to do the same, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960 and 963 and 18 U.S.C. § 924(g) (the "TARGET OFFENSES").

3.    For the reasons set forth in this affidavit, I submit that there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by the people who are the subjects of this investigation.  These include, among others, ALEXANDER CONCEPCION, a/k/a "Alex Concepcion," FNU LNU, a/k/a "G," FNU LNU, a/k/a "Bienve," FNU LNU, a/k/a "Johnny Santana," and others as yet unidentified (the "TARGET SUBJECTS").

4.    The requested order is sought for a period of time

2

155

until the interceptions fully reveal the identity of and manner
in which the TARGET SUBJECTS engage in the below-enumerated
offenses, or for a period of thirty (30) days, whichever occurs
first, pursuant to Title 18, United States Code, Section 2518(5).
Pursuant to Section 2518(5) of Title 18, United States Code, it
is further requested that the 30-day period be measured from the
earlier of the date interceptions begin or ten days from the date
of the Court's Order.

 5. This case is being investigated by the FBI and
other law enforcement agencies.  I have personally participated
in the investigation of the offenses referred to in paragraph 2
above, and make this affidavit based on my personal participation
in this investigation and based on reports made to me by FBI
agents and other law enforcement authorities.  Except where
otherwise noted, the information set forth in this affidavit has
been provided to me by other law enforcement agents who have
assisted in the investigation.  Unless otherwise noted, wherever
in this affidavit I assert that a statement was made, the
statement was made by another law enforcement officer (any of
whom may have had either direct or hearsay knowledge of that
statement) to whom I or other law enforcement officers have
spoken or whose reports I have read and reviewed.  Such
statements are reported in substance and in part, unless
otherwise indicated.  Likewise, information resulting from

3

surveillance sets forth either my personal observations or
information provided directly or indirectly through other law
enforcement officers who conducted such surveillance.

6.    Since this affidavit is being submitted for the
limited purpose of securing an order authorizing the interception
of wire communications, I have not included details of every
aspect of this investigation to date.  Facts not set forth herein
are not being relied on in reaching my conclusion that an order
should be issued.  Nor do I request that this Court rely on any
facts not set forth herein in reviewing this application for an
order authorizing the interception of wire communications.

## SUBJECTS AND OFFENSES

7.    This application is based upon an investigation of
gun and drug-trafficking operations by the TARGET SUBJECTS.
There is probable cause to believe that the TARGET SUBJECTS have
committed, are committing, and will continue to commit the TARGET
OFFENSES.

## THE TARGET CELLPHONE

8.    There is probable cause to believe that the TARGET
SUBJECTS have been using, are using, and will use: the cellular
telephone assigned call number (347) 680-7262, with International
Mobile Subscriber Information ("IMSI") number 316010160198103,
and Universal Fleet Mobile Identification ("UFMI") number
176*887*8959, a cellular telephone with subscriber information of

4

157

GSD LML, 98 Post Avenue, New York, New York, with service

provided by Sprint/Nextel Corporation (the "TARGET CELLPHONE"),[1]

and any telephone numbers subsequently assigned to or accessed by

or through the same IMSIs as the TARGET CELLPHONE, or assigned to

the instrument bearing the same IMSIs as the TARGET CELLPHONE, as

well as any IMSIs subsequently assigned to the instrument bearing

the same telephone number assigned to the TARGET CELLPHONE, and

any other telephones accessed by instruments bearing those IMSIs.

　　　9.    I have been informed by other law enforcement

personnel who are familiar with the applicable telephone

technology that a "portable cellular telephone" (or a "mobile

telephone") can be used both within a vehicle and outside a

vehicle through the use of a portable battery pack.  The cellular

telephone system divides New York City and other metropolitan

areas into many small coverage areas, which are called "cells."

As a vehicle in which a portable cellular telephone is located,

or the cellular telephone itself, is moved from one cell to

another, transmitters within each cell and a master switching

network permit "wire communications" to be completed.  Each

portable cellular telephone that does not contain party lines

---

[1]    The TARGET CELLPHONE utilizes an IMSI, encoded into a
removable computer chip located inside the instrument.
Accordingly, this application seeks authorization to intercept
communications occurring over any telephones or telephone numbers
accessed by or through the use of the IMSI number identified
above.  The number assigned to the computer chip is unique to the
subscriber, as opposed to the phone.

bears a unique ESN or electronic serial number and an assigned
telephone number.  It is requested that interception be permitted
over the TARGET CELLPHONE, and any other telephone numbers
accessed through the above-listed ESN number for the TARGET
CELLPHONE, and any ESN numbers accessed through the phone numbers
assigned to the TARGET CELLPHONE.  In addition, it is requested
that background conversations, in the vicinity of the TARGET
CELLPHONE while it is off the hook or otherwise in use, also be
permitted to be intercepted.

        10.  Because of the mobility of portable cellular
telephones - which are mobile interception devices - pursuant to
Title 18, United States Code, Section 2518(3), authorization is
requested for interception of wire communications within the
Southern District of New York, and outside that jurisdiction but
within the United States in the case of a mobile interception
device.

        11.  It is anticipated that the TARGET SUBJECTS will
use the TARGET CELLPHONE to place calls and relay messages to and
from the Southern District of New York, as well as other
locations.  This belief is supported by the facts described
below.  Pursuant to United States v. Rodriguez, 968 F.2d 130 (2d
Cir.) cert. denied, 506 U.S. 847 (1992), a court in the Southern
District of New York is empowered to issue an Order for the
interception of wire communications over telephones located in

6

159

other districts, as long as the interceptions of these communications are first heard in the Southern District of New York.

12.   In connection with the telecommunication company which provides the service for the TARGET CELLPHONE, all interceptions will automatically be routed to New York, New York, regardless of where the telephone calls are placed to or from. Accordingly, all interceptions will first be heard in the Southern District of New York.  During the requested wire surveillance, all monitoring will be performed in New York, New York, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including special agents of the FBI and government employees or individuals operating under a contract with the Government, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

## OBJECTIVES

13.   There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will help to reveal:  (i) the nature, extent and methods of operation of the TARGET SUBJECTS' narcotics distribution organization; (ii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities; (iii) the receipt

160

and distribution of contraband and money involved in those

activities; (iv) the locations and items used in furtherance of

those activities; (v) the existence and locations of records;

(vi) the location and source of resources used to finance their

illegal activities; and (vii) the location and disposition of the

proceeds from those activities.  In addition, these wire

communications are expected to constitute admissible evidence of

the commission of the TARGET OFFENSES.

### PRIOR APPLICATIONS

14.  I have been informed that reviews have been done

of the electronic surveillance files of the United States Bureau

of Immigration and Customs Enforcement, the Drug Enforcement

Administration, and the Federal Bureau of Investigation.[2]  Based

on these reviews, I have been informed that there have been no

prior applications for Court authorization to intercept wire,

oral, or electronic communications over the TARGET CELLPHONE in

the United States.  I have been further informed that there have

been no prior applications for Court authorization to intercept

wire, oral, or electronic communications for the TARGET SUBJECTS

in the United States, except as follows:

a.  On or about June 20, 2007, the Honorable Alvin K.

Hellerstein, United States District Judge, Southern District of

---

[2]    A check of FBI Surveillance databases was completed on or
about June 11, 2007.

8

New York, issued an order (the "June 20th Order") authorizing the interception of wire communications occurring over the TARGET CELLPHONE.

        b.   On or about June 21, 2007, the Attorney General of the United States authorized the interception of wire communications occurring over a cellular telephone assigned call number 347-744-6686, and bearing IMSI 316010160089409, and UFMI 176*882*2573.  On or about June 22, 2007, the Honorable P. Kevin Castel, United States District Judge, Southern District of New York, issued an order pursuant to Title 18, United States Code, Section 2518(7) approving the June 21, 2007 authorization.

## I.   THERE IS PROBABLE CAUSE TO BELIEVE THAT THE TARGET SUBJECTS WILL USE THE TARGET CELLPHONE IN FURTHERANCE OF THE TARGET OFFENSES

### A.   Overview

        15.  The FBI began this current investigation after receiving information from an individual ("I-1") who is charged with various federal crimes.  The FBI interviewed I-1 in February and May 2007 while I-1 was detained at a Pennsylvania correctional facility (the "Facility"), where he remains awaiting trial.  A fuller background concerning I-1 and the initial information that I-1 provided is set forth in the materials submitted in support of the June 20th Order, including the affidavit of Supervisory Special Agent Michael N. Rossanova ("ROSSANOVA AFFIDAVIT"), which is incorporated by reference

9

162

herein.

16.    During the February and May 2007 interviews, I-1 said that, for a period of approximately one to two months, his cell-mate at the Facility was a man named "Alex Concepcion." Records maintained by the Facility indicate that I-1 shared a cell with ALEXANDER CONCEPCION at the Facility during the early part of 2007.   According to I-1, CONCEPCION stated that he knew individuals who were seeking to obtain explosives and other weapons for a 2007 attack on United States bridges and tunnels. CONCEPCION asked I-1 if he (I-1) could help CONCEPCION to procure weapons and explosives to facilitate such attacks.   CONCEPCION indicated that he was low on cash, and that he and I-1 could make a large amount of money by obtaining weapons and explosives for these individuals.   I-1 understood that CONCEPCION believed that he (I-1) could help CONCEPCION to obtain weapons and explosives for these individuals because CONCEPCION believed that I-1 is a senior organized-crime figure.

17.    Based on this and other information set forth in the ROSSANOVA AFFIDAVIT, the Government sought and obtained authorization to intercept the TARGET CELLPHONE pursuant to the June 20th Order.   As set forth in greater detail below, these calls did not provide further evidence concerning any plot to obtain explosives and weapons for the purpose of blowing up bridges and tunnels in the United States.   The calls did,

however, demonstrate that ALEXANDER CONCEPCION and the other

TARGET SUBJECTS are involved in narcotics and weapons

trafficking.

B.    **TITLE-III INTERCEPTION OF THE TARGET
      CELLPHONE PURSUANT TO THE JUNE 20TH
      ORDER**

18.    Interception of the TARGET CELLPHONE pursuant to

the June 20th Order began on or about June 20, 2007 and is

ongoing.  The pertinent calls made and received on the TARGET

CELLPHONE, some of which are summarized below, demonstrate that

TARGET SUBJECT ALEXANDER CONCEPCION was using the TARGET

CELLPHONE to discuss the TARGET SUBJECTS' narcotics and weapons

trafficking activities.  The following descriptions are based

upon my review of the line sheets, my review of summaries of

certain of the calls completed by the monitoring agents, and

discussions with the supervising agents.  Many of the intercepted

conversations have been in Spanish.  These conversations are the

product of preliminary translation and are subject to further

revision.  Based on my training and experience and my discussions

with other law enforcement officers involved in this

investigation, I have also included in the following summaries

interpretations of certain terms and phrases.

19.    On or about June 22, 2007, at approximately 9:50

p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a

telephone call to a male who has not yet been identified ("U/M

11

164

#1"). During the referenced call, U/M #1 told CONCEPCION that he knows a man who can obtain for him (U/M #1) a "Mossberg," the "shit that the SWAT team be using."

20. Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that, in this conversation, U/M #1 and ALEXANDER CONCEPCION were talking about a connection that U/M #1 has to an individual who can get for U/M # 1 a substantial weapon — such as a shotgun or high-powered rifle of the kind manufactured by O.F. Mossberg & Son and often used by special police squads.

21. On or about June 27, 2007, at approximately 7:17 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a telephone call to a male who has not yet been identified ("U/M #2"). During the referenced call, U/M #2 told CONCEPCION that he has a "big one," which U/M # 2 described as a nine millimeter with a scope; CONCEPCION asked as to the price of the "big one," and U/M # 2 responded by stating that he wanted something up front.

22. Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that, in this conversation, U/M # 2 and ALEXANDER CONCEPCION were talking about CONCEPCION buying from U/M #2 a sophisticated weapon — a nine millimeter

12

rifle, equipped with a scope for ease in spotting and hitting targets.  The discussion focused, in part, on the possibility of CONCEPCION paying for the weapon by putting some money down up-front, and then paying fully for the weapon later.

23.  On or about June 27, 2007, at approximately 6:43 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a telephone call to a male who has not yet been identified ("U/M #3"), but who may go by the name "G."  During the referenced call, CONCEPCION told U/M #3 that he has "two" ready; U/M # 3 responded by indicating that he was fixing the car and was nearly ready to go.  U/M #3 suggested that they (U/M #3 and CONCEPCION) could stash everything near CONCEPCION's house and that, if CONCEPCION preferred, he (CONCEPCION) could cover his face while undertaking the transaction in question.

24.  Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that, in this conversation, U/M # 3 and ALEXANDER CONCEPCION were talking about CONCEPCION selling narcotics in an especially stealthy fashion (possibly with his face covered) — and secreting the narcotics in the "trap" of a vehicle (which needed to be fixed) and then at a location near CONCEPCION's house.

25.  On or about July 6, 2007, at approximately 4:01 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a

telephone call to a male who has not yet been identified ("U/M #1"). During the referenced call, CONCEPCION told U/M #1 that "they" showed him (CONCEPCION) a "45" and a "38." CONCEPCION stated that he would go pick it up, but that it does not have "rocks"; UM #1 said that he would work on getting "rocks."

26. Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that, in this conversation, U/M #1 and ALEXANDER CONCEPCION were talking about CONCEPCION seeking to obtain a weapon (a .45 or .38 caliber pistol), as well as some bullets ("rocks").

27. On or about July 7, 2007, at approximately 12:54 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a telephone call from a male who has not yet been identified, but who may be U/M #1. During the referenced call, U/M #1 asked CONCEPCION if he (CONCEPCION) had a "picture" of some hair "grease"; U/M #1 further stated that he wanted to show a "picture" to his friends, and was not sure how much they wanted.

28. Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that, in this conversation, U/M # 1 was requesting from ALEXANDER CONCEPCION a sample ("picture") of narcotics that he (U/M #1) could show to his associates, so that they could determine how much to purchase in

14

167

the way of narcotics.

29.    On or about July 7, 2007, at approximately 5:59 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a telephone call to a male who has not yet been identified, but who may be U/M #1.    During the referenced call, U/M #1 and CONCEPCION discussed money that U/M #1 was said to owe CONCEPCION for two "ounce[s]."

30.    Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that, in this conversation, U/M # 1 and ALEXANDER CONCEPCION were discussing a narcotics debt U/M #1 owed to CONCEPCION.

31.    On or about July 11, 2007, at approximately 11:45 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a telephone call to an unidentifed male ("U/M #5").    U/M #5 told CONCEPCION that he has a "guy inside . . . helping us [who will] open the door."    He also stated that there were "4 niggers, 2 things.    So you have to be prepared."    U/M #5 also stated that "we haven't done it yet because we haven't found a toy that we're comfortable with, unless you can do it with a .22."    CONCEPCION stated that "tomorrow I'm going to introduce you to a guy who can get you a toy for $500."

32.    Based on my training and experience, my participation in this investigation, and my review of other

168

intercepted communications, I believe that, in this conversation, ALEXANDER CONCEPCION and U/M #5 were planning a home invasion robbery of a drug dealer. In the initial part of the call, they were discussing the robbery of 2 pounds of marijuana from four individuals. U/M #5 indicated that a person on the inside would help the crew get into the apartment to facilitate the robbery. The latter part of the call, they were discussing the weapons that would be needed to do the robbery. Finally, CONCEPCION proposed introducing U/M #5 to someone who can sell him a gun for the robbery for $500.

33. On or about July 15, 2007, at approximately 3:44 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, made a telephone call to a male identified as "Bienve." During the referenced call, CONCEPCION asked "Bienve" for "three kilos" and Bienve replied that he would give CONCEPCION each kilo for "17."

34. Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that, in this conversation, ALEXANDER CONCEPCION and "Bienve" were discussing a narcotics transaction for three kilograms of cocaine and that Bienve was quoting a price of $17,000 per kilogram.

35. On or about July 15, 2007, at approximately 3:45 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a telephone call from a male who has not yet been identified

16

("U/M #4").  During the referenced call, CONCEPCION asked U/M #4 if he (U/M #4) would be bringing the "three kilos."

36.  Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that, in this conversation, ALEXANDER CONCEPCION and U/M #4 were discussing the delivery of three kilograms of cocaine.

37.  On or about July 16, 2007, at approximately 9:27 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a telephone call from a male who has been identified as "Johnny Santana."  CONCEPCION told "Johnny Santana" that he was looking for one kilo for "Black."

38.  Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that, in this conversation, ALEXANDER CONCEPCION and "Johnny Santana" were discussing the purchase of one kilogram of cocaine.

39.  On or about July 17, 2007, at approximately 11:27 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, recieved a telephone call to a male identified "Johnny Santana."  CONCEPCION told "Johnny Santana" "that shit's not going down today.  It's going to go down tomorrow.  The man is cold.  I spoke to him.  That weed that he has is not that good.  I want to wait until he has some good piff."

17

170

40.   Based on my training and experience, my participation in this investigation, and my review of other intercepted communications, I believe that, in this conversation, ALEXANDER CONCEPCION and "Johnny Santana" were discussing the reasons for delaying a home invasion robbery of a drug dealer for one day.  When CONCEPCION stated that the dealer is "cold" he meant that the drugs he had were not worth doing the robbery.

## II.   ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED OR APPEAR UNLIKELY TO SUCCEED IF TRIED; THERE IS A NEED FOR THE CONTINUED INTERCEPTION OF WIRE COMMUNICATIONS OVER THE TARGET CELLPHONE

41.   In furtherance of the objectives of this investigation, see supra Paragraph 13, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives.

42.   While the calls intercepted pursuant to the June 20th Order constitute evidence of illegal narcotics and weapons trafficking, the interception of wire communications to date has been insufficient to permit law enforcement authorities to achieve the objectives of the investigation.  This includes the inability to confirm and reveal fully the identity of numerous co-conspirators of ALEXANDER CONCEPCION, such as FNU LNU, a/k/a "Johnny Santana," FNU LNU, a/k/a "G," and FNU LNU, a/k/a

"Bienve," the location of any drugs or guns, or the location of any drugs or gun trafficking transactions. Since the issuance of the July 20th Order, no new sources have been identified and no arrests have been made.

43. It appears from the evidence set forth above that the TARGET CELLPHONE has been used and is being used by ALEXANDER CONCEPCION as he works to obtain weapons and narcotics on behalf of other persons. Through the use of Grand Jury subpoenas, it is possible to obtain from the Facility audio recordings of calls between I-1 and CONCEPCION. However, this body of audio recordings does not and will not include audio recordings of telephone calls between CONCEPCION and people other than I-1. For example, audio recordings obtained from the Facility do not contain recordings of CONCEPCION speaking on the telephone with other person — about the specifications of the weapons and narcotics wanted; how the other persons plan to pay for them; where the weapons and narcotics will be stored; and who the weapons and narcotics should be delivered to. To obtain evidence as to the content of those conversations between CONCEPCION and other persons, audio recordings from the Facility are insufficient.

44. Evidence as to the content of those conversations between ALEXANDER CONCEPCION and other persons is crucial here, and can not be obtained through alternative investigative

19

techniques.  Although this investigation has made use of I-1, it is highly unlikely that any arrangement for the procurement of weapons or narcotics will be directly consummated between I-1 and CONCEPCION.  I-1 is known by CONCEPCION to be at the Facility, where I-1's calls are recorded, and where I-1 has no unfettered access to people or groups who might provide weapons or narcotics to CONCEPCION or to other persons.  Accordingly, this investigation cannot achieve its objectives solely by learning the substance of communications between I-1 and CONCEPCION, whether by learning of the substance of these communications from I-1 or by obtaining audio recordings from the Facility.

45.  In order to advance the goals of this investigation, and since the June 20th Order was issued, the Government sought to introduce an undercover law-enforcement officer ("U/C") to ALEXANDER CONCEPCION through I-1.  These efforts failed because CONCEPCION stopped accepting and responding to I-1's telephone calls.  Even had I-1 succeeded, it is unlikely that CONCEPCION's co-conspirators would have worked with the U/C.  Based on my training and experience, I know that people who are seeking to obtain dangerous contraband strongly prefer to deal with intermediaries (such as CONCEPCION) with whom they are already familiar — rather than dealing directly with suppliers of contraband (such as the U/C) that they have not previously met or had substantial dealings with.

20

173

46. Aside from I-1, the Government is not aware of any individuals who are associates of ALEXANDER CONCECPCION, and who might be introduced to CONCEPCION in a covert capacity. In addition, and as noted above, law-enforcement agents have not yet conclusively determined the identity of the other persons working with CONCEPCION. Accordingly, learning about the TARGET SUBJECTS and their participation in the TARGET OFFENSES through individuals other than I-1 is not feasible.

47. Law-enforcement agents have already performed limited surveillance in connection with this case. However, because none of the TARGET SUBJECTS except for ALEXANDER CONCEPCION have been definitively identified, surveillance is of limited utility at this time. Moreover, since the June 20th Order was issued, agents have attempted to conduct physical surveillance of CONCEPCION on numerous occasions. They have seen CONCEPCION repeatedly change cars over this time period. They have also seen him drive in an erratic manner. These things have made surveillance difficult. In addition, based on my training, I know that narcotics and weapons traffickers are extremely surveillance conscious. Accordingly, it will not be possible to learn about the substance of the TARGET SUBJECTS' plans — or even the full scope of ALEXANDER CONCEPCION's activities — by conducting physical surveillance. In addition, if the intensity of existing surveillance were to be increased, and if the

21

174

subjects of this investigation became alerted to the existence of such surveillance, the result might be the temporary cessation of their illegal activities or a change in their instrumentalities or methods at a critical point in the investigation.  For the foregoing reasons, I do not believe that physical surveillance will be sufficient to accomplish the goals of the investigation.

48.  Moreover, wire surveillance will enhance the prospects of fruitful physical surveillance while decreasing the likelihood of the TARGET SUBJECTS becoming alerted to the investigation.  Specifically, with the knowledge provided beforehand by wire surveillance that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, thus minimizing the risks of discovery inherent in following subjects or remaining at target locations for long periods of time.

49.  Telephone toll records and pen register devices provide only limited information.  These methods do not provide law-enforcement officials with the content of conversations or the identities of the speakers.  This is primarily because a telephone number appearing in the records may not be listed or subscribed in the name(s) or address(es) of the person(s) using the telephone — indeed, that appears to be the case with regard to the TARGET CELLPHONE, which is being used by ALEXANDER CONCEPCION but which is not subscribed to in his name.  See supra

22

175

¶ 2.  Indeed, there are other numerous telephones which have been in frequent contact with the TARGET CELLPHONE for which we have not been able to identify the telephones' owners or users.

50.  Use of a federal grand jury does not appear to be a promising method of investigation.  The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation.  Witnesses who could provide additional relevant evidence to a grand jury have not been identified or would themselves be participants in the plans of CONCEPCION and the other TARGET SUBJECTS.  Such individuals would face prosecution themselves; it is unlikely therefore that any of them would testify voluntarily.  Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony.  Immunizing them could thwart the public policy that they be held accountable for their crimes.  Moreover, it is likely that such subjects would go into contempt rather than testify.  The issuance of grand jury subpoenas to other individuals likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of an investigation.  Moreover, not all of the TARGET SUBJECTS have been identified or located, and, in the absence of further evidence identifying co-conspirators and their respective involvement in weapons and explosive trafficking, it

23

is difficult to determine whom to subpoena to the grand jury.

51.  Based upon my experience, I believe that interviews of the TARGET SUBJECTS or their known associates would produce insufficient information as to the identities of all of the persons involved with the TARGET SUBJECTS in the TARGET OFFENSES.  First, most of the TARGET SUBJECTS have not been identified or located.  Second, any responses to the interviews would contain a significant number of untruths, diverting the investigation with false leads or otherwise frustrating the investigation.  Third, questioning any of the co-conspirators would alert the other co-conspirators, and cause a change in their methods of operation before all of the co-conspirators are identified, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence.

52.  Applications for search warrants are not appropriate at this stage of the investigation, as the locations where the TARGET SUBJECTS store relevant planning documents and financial records, and where they plan to receive, hide, and distribute the weapons and narcotics in question have not been identified.  Moreover, investigative methods used to date do not by themselves seem likely to yield this information.  Wire surveillance will assist law enforcement in identifying such locations, so that search warrants for such locations may be

24

177

obtained at a later time.

53.   Attempting to arrest the TARGET SUBJECTS at this
point would mean that several of the objectives of this
investigation would be unfulfilled.   Most of the TARGET SUBJECTS
have yet to be identified.   If law-enforcement officials tried to
make any arrests, unidentified co-conspirators would almost
certainly cease their illegal activities or change the locations,
instrumentalities and methods used to conduct their illegal
activities, thereby frustrating the investigation.

54.   For the foregoing reasons, I believe that
alternative investigative techniques would fail to accomplish the
objectives of the investigation.   Wire surveillance is necessary.

## III. REQUEST FOR AUTHORIZATION

### A.    MINIMIZATION

55.   All monitoring of wire communications over the
TARGET CELLPHONE will be minimized in accordance with Chapter 119
of Title 18, United States Code.

56.   The "investigative or law enforcement officers of
the United States" and translators, if necessary, who are to
carry out the requested interception of wire communications, will
be instructed concerning the steps they should take to avoid
infringing upon any attorney-client privilege or other recognized
privileges.   In addition, all communications intercepted will be

25

178

conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring will cease when it is determined that the monitored conversation is not criminal in nature. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that neither the TARGET SUBJECTS or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If an interception is minimized, monitoring agents shall spot check to insure that the conversation has not turned to criminal matters.

57. It is requested that the order provide that, if necessary, translators be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted communications. Certain subjects of this investigation are expected to communicate with each other in the Spanish language. It is therefore necessary to secure the services of translators in order to assist the agents in monitoring the wire surveillance and translating the intercepted communications. All such translators will be under contract to the FBI and will be directly supervised by the FBI. It is further requested, pursuant to Section 2518(5), Title 18, United States Code, that

26

in the event the intercepted communications are in a code or
foreign language, and an expert in that code or foreign language
is not reasonably available during the interception period, that
minimization may be accomplished as soon as practicable after
such interception.

**B.    AUTHORIZATION REQUEST**

58.    Based on the foregoing, it is my opinion that the
continued interception of wire communications occurring over the
TARGET CELLPHONE, as specified above, is essential to uncover the
full scope of the TARGET SUBJECTS' narcotics activities.

59.    In as much as the illegal operation described
herein is a continuing conspiracy involving numerous persons as
yet unidentified and unknown, it is requested that it be ordered,
as more fully stated in the accompanying application, that
authorization to intercept not terminate when the sought wire
communications are first obtained, but continue until
interception fully reveals the objectives set forth above, or for
a period of thirty (30) days, whichever is earlier.  The 30-day
period shall be measured from the earlier of the date on which
investigative or law enforcement officers begin to conduct
interception under this Court's Order or ten days from the date
of this Court's Order.

60.    Pursuant to the provisions of Title 18, United
States Code, Sections 2518(4), it is requested that it be ordered

27

that Sprint/Nextel Corporation, the service provider for the
TARGET CELLPHONE, furnish the technical assistance necessary to
accomplish the interception unobtrusively and with a minimum of
interference with such services as those providers accord the
persons whose communications are to be intercepted (including all
dial digits for both incoming and outgoing calls), pen register
information, and audio interception capability. The assistance
of Sprint is required to accomplish the objectives of the
requested interceptions. Reasonable expenses incurred pursuant
to this activity will be processed for payment by the FBI.

61. It is further requested that Sprint/Nextel
Corporation, a provider of electronic communications service as
defined in Title 18, United States Code, Section 2510(15), shall
disclose to the United States FBI all published and non-published
subscriber information and toll records and information relevant
to this investigation, that is, all such information pertaining
to the telephone numbers associated with telephones, digital
display devices, and mobile telephones used, if any, which may be
requested in furtherance of this investigation, within 24 hours
of said request, there being reason to believe that the contents
of the information sought are relevant to a legitimate law
enforcement inquiry.

62. It is further requested that any tracing operation
and the use of Caller ID service for the TARGET CELLPHONE be

28

181

without geographical limit.

63.    It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.


ERIC M. PAHOLSKY
Special Agent
U.S. FEDERAL BUREAU OF INVESTIGATION


Sworn to before me this
____ day of July 2007


UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK
Victor Marrero

29

182



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 31, 2007

TO BE IMPOUNDED
UNDER SEAL

BY HAND

The Honorable Victor M. Marrero
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re: **First Periodic Report Pursuant to**
> **The Court's Order of July 20, 2007,**
> **Authorizing the Continued**
> **Interception of Wire Communications**

Dear Judge Marrero:

This report is submitted pursuant to the Court's Order, signed July 20, 2007 (the "July 20, 2007 Order") authorizing the continued interception of wire communications occurring over the cellular telephone assigned call number (347) 680-7262, with International Mobile Subscriber Information ("IMSI") number 316010160198103, and Universal Fleet Mobile Identification ("UFMI") number 176*887*8959, a cellular telephone with subscriber information of GSD LML, 98 Post Avenue, New York, New York, with service provided by Sprint/Nextel Corporation (the "TARGET CELLPHONE"), and any telephone numbers subsequently assigned to the instruments bearing the same IMSI number as the TARGET CELLPHONE, as well as any IMSI number subsequently assigned to the instrument bearing the same telephone number assigned to either of the TARGET CELLPHONE.

With regard to the July 20, 2007 Order, the tenth day was July 30, 2007.

Instructions regarding minimization — the substance of which was explained, in person and before the monitoring began, by Assistant United States Attorney Michael Farbiarz to agents of

197

The Honorable Victor Marrero
July 31, 2007
Page 2

the Federal Bureau of Investigation ("FBI"), other law
enforcement officers, and translators assigned to assist the FBI
in connection with this case — were provided to these persons and
posted in the monitoring plant.  Monitoring of the TARGET
CELLPHONE began June 20, 2007 pursuant to a prior order, ceased
for a period of time on July 20, 2007, resumed on July 20, 2007
pursuant to the July 20, 2007 Order, and is ongoing as of the
date of this report.

### Statistical Overview of Intercepted Calls
### Over the TARGET CELLPHONE

Interception of communications over TARGET CELLPHONE
from July 20, 2007 up to and including July 29, 2007, have
confirmed that the TARGET CELLPHONE is being consistently used by
the TARGET SUBJECT, ALEXANDER CONCEPCION.

For the Court's information, the FBI has prepared the
following statistical summary of calls intercepted over the
TARGET CELLPHONE from July 20, 2007 up to and including July 29,
2007:

| | |
|---|---|
| Total Number of Intercepted Calls: | 2042 |
| Number of Complete Calls: | 959 |
| Number of Minimized Calls: | 2 |
| Minimized Calls Out of Completed: | 0.21% |
| Number of Calls Flagged as Pertinent: | 209 |
| Number of Minimized Calls Flagged as Pertinent: | 0 |
| Number of Calls > 2 Minutes Duration: | 33 |
| Number of Calls Minimized > 2 Minutes Duration: | 2 |
| Number of Pertinent Calls > 2 Minutes Duration: | 22 |
| Calls Flagged as Privileged: | 0 |

The Honorable Victor Marrero
July 31, 2007
Page 3

## Description of Selected Communications
## <u>Intercepted Over the TARGET CELLPHONE</u>

Set forth below are summaries of some of what appear to be pertinent conversations intercepted over the TARGET CELLPHONE during the period from July 20, 2007 up to and including July 29, 2007. The summaries listed below do not, however, constitute a complete list of the pertinent conversations. The following descriptions are based upon my review of the line sheets, my review of summaries of certain of the calls completed by the monitoring agents, and discussions with the supervising agents.[1] Many of the intercepted conversations have been in Spanish. These conversations are the product of preliminary translation and are subject to further revision.

### <u>July 25, 2007</u>

On or about July 25, 2007, at approximately 12:45 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a telephone call from a male who has not yet been identified. During the referenced call, the caller asked CONCEPCION "how much will you give me the bird for." CONCEPCION asked whether it was "from the sample I gave you the other day" and the caller replied "the white stuff." CONCEPCION told him "the white stuff 24.50." CONCEPCION and the caller then negotiated over the price in the event that the caller's buyer took "4."

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, the caller and CONCEPCION were talking about the sale of 4 kilograms of powder cocaine at an initial quoted price of $24,500 per kilogram.

Also on or about July 25, 2007, at approximately 1:36 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a telephone call from a male who has not yet been identified. During the referenced call, CONCEPCION told the caller that he was in the "heights" waiting to see if he could get "25 white t-shirts." The caller told CONCEPCION that he could get something "pure by 26" from a friend in "nego." The caller stated that what he has is "better than Bolivian."

---

[1] Copies of the summary log sheets are available for the Court's review upon request.

The Honorable Victor Marrero
July 31, 2007
Page 4

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, the caller and CONCEPCION were talking about the quality ("better than Bolivian") and price ($26,000 per kilogram) of cocaine.  The reference to "nego" is a phoenetic transcription of Nagle Avenue in New York City.

### July 26, 2007

On or about July 26, 2007, at approximately 11:43 p.m, ALEXANDER CONCEPCION, using the TARGET CELLPHONE, placed a telephone call to an unidentified person. CONCEPCION and the person discussed the "thing" that they have to do and referenced "Little Al's" customer.  The person said that they could do it with "the 38 and the shy."  They then discussed who had the "38." On that same night, at about 11:43 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, placed a telephone call to FNU LNU, a/k/a "OG."  CONCEPCION informed "OG" that a "customer" was coming in 15 minutes for half a "thing" and clarified "white." OG responded "just call me when I have to smack that nigga."

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in these two conversations, CONCEPCION, OG, and the unidentified person are discussing a plan to rob a half kilogram of cocaine ("white") from a customer of "Little Al."  They also discussed that they would use a .38 caliber ("the 38") and a shotgun ("the shy").

### Need for Continued Interception

The Government submits that the foregoing pertinent calls demonstrate that progress is being made toward the achievement of the authorized objectives of the interception order.

The Government submits that continued interception of wire communications occurring over the TARGET CELLPHONE is necessary to assist in revealing: (i) the plans and methods of operation of the TARGET SUBJECTS as they participate in the TARGET OFFENSES; (ii) the nature and extent of the TARGET SUBJECTS' participation in the TARGET OFFENSES; (iii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iv) the locations and items used by the TARGET

The Honorable Victor Marrero
July 31, 2007
Page 5

SUBJECTS in furtherance of their commission of the TARGET
OFFENSES; (v) the existence and locations of records that relate
to the TARGET OFFENSES; and (vi) the sources of resources used by
the TARGET SUBJECTS to finance their illegal activities.

Although interceptions to date appear to be useful in
helping to determine this information, at present the objectives
have not yet been fully achieved. Continued interceptions will
be useful in furthering the objectives of the investigation.
Based upon the above, we expect to continue monitoring the TARGET
CELLPHONES for the remainder of the thirty-day period authorized
by the Court's July 20, 2007 Order. The Court will be duly
advised concerning further interceptions and monitoring in
subsequent periodic reports.

Finally, the Government respectfully requests that,
with the exception of working copies for the Government, this
letter be sealed, impounded, and held in the custody of the
United States Attorney's Office for the Southern District of New
York until further order of the Court. To this end, I am
enclosing two originals of this letter, as well as a sealing
envelope.

I can be reached at the number listed below if the
Court has any questions, and to arrange for this letter to be
picked up after it has been received and reviewed.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: _William J. Harrington_

William J. Harrington
Assistant United States Attorney
(212) 637-2331

RECEIVED AND REVIEWED:

THE HONORABLE VICTOR MARRERO
UNITED STATES DISTRICT JUDGE _Part I_
SOUTHERN DISTRICT OF NEW YORK

2 August 2007  11:50 a.m.
Date/Time



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 10, 2007

<u>TO BE IMPOUNDED</u>
<u>UNDER SEAL</u>

<u>BY HAND</u>

The Honorable Victor M. Marrero
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re: **Second Periodic Report Pursuant to**
> **The Court's Order of July 20, 2007,**
> **Authorizing the Continued**
> **Interception of Wire Communications**

Dear Judge Marrero:

This report is submitted pursuant to the Court's Order, signed July 20, 2007 (the "July 20, 2007 Order") authorizing the continued interception of wire communications occurring over the cellular telephone assigned call number (347) 680-7262, with International Mobile Subscriber Information ("IMSI") number 316010160198103, and Universal Fleet Mobile Identification ("UFMI") number 176*887*8959, a cellular telephone with subscriber information of GSD LML, 98 Post Avenue, New York, New York, with service provided by Sprint/Nextel Corporation (the "TARGET CELLPHONE"), and any telephone numbers subsequently assigned to the instruments bearing the same IMSI number as the TARGET CELLPHONE, as well as any IMSI number subsequently assigned to the instrument bearing the same telephone number assigned to either of the TARGET CELLPHONE.

With regard to the July 20, 2007 Order, the twentieth day was August 9, 2007.

Instructions regarding minimization — the substance of which was explained, in person and before the monitoring began, by Assistant United States Attorney Michael Farbiarz to agents of

The Honorable Victor Marrero
August 10, 2007
Page 2

the Federal Bureau of Investigation ("FBI"), other law
enforcement officers, and translators assigned to assist the FBI
in connection with this case — were provided to these persons and
posted in the monitoring plant.  Monitoring of the TARGET
CELLPHONE began pursuant to a prior order, ceased for a period of
time on July 20, 2007, resumed on July 20, 2007 pursuant to the
July 20, 2007 Order, and is ongoing as of the date of this
report.

**Statistical Overview of Intercepted Calls
<u>Over the TARGET CELLPHONE</u>**

Interception of communications over TARGET CELLPHONE
from July 20, 2007 up to and including August 8, 2007, have
confirmed that the TARGET CELLPHONE is being consistently used by
the TARGET SUBJECT, ALEXANDER CONCEPCION.

For the Court's information, the FBI has prepared the
following statistical summary of calls intercepted over the
TARGET CELLPHONE from July 20, 2007 up to and including July 29,
2007:

| | |
|---|---|
| Total Number of Intercepted Calls: | 4262 |
| Number of Complete Calls: | 1650 |
| Number of Minimized Calls: | 2 |
| Minimized Calls Out of Completed: | 0.12% |
| Number of Calls Flagged as Pertinent: | 331 |
| Number of Minimized Calls Flagged as Pertinent: | 0 |
| Number of Calls > 2 Minutes Duration: | 54 |
| Number of Calls Minimized > 2 Minutes Duration: | 2 |
| Number of Pertinent Calls > 2 Minutes Duration: | 36 |
| Calls Flagged as Privileged: | 0 |

The Honorable Victor Marrero
August 10, 2007
Page 3

### Description of Selected Communications
### Intercepted Over the TARGET CELLPHONE

Set forth below are summaries of some of what appear to be pertinent conversations intercepted over the TARGET CELLPHONE during the period from July 30, 2007 up to and including August 8, 2007. The summaries listed below do not, however, constitute a complete list of the pertinent conversations. The following descriptions are based upon my review of the line sheets, my review of summaries of certain of the calls completed by the monitoring agents, and discussions with the supervising agents.[1] Many of the intercepted conversations have been in Spanish. These conversations are the product of preliminary translation and are subject to further revision.

### July 31, 2007

On or about July 31, 2007, at approximately 10:50 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a telephone call from an unknown person. During the referenced call, the caller asked CONCEPCION "did you have the phone off earlier" and then explained that he "had a customer for a pound of haraka" and had called CONCEPCION around "7 or 8". CONCEPCION then stated to the caller that his phone was on at that time.

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, the caller and CONCEPCION were talking about a potential sale of marijuana.

### August 1, 2007

On or about August 1, 2007, at approximately 6:40 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a telephone call from an unknown person. During the referenced call, the caller asked CONCEPCION "can you get some e-pill around there". The caller then explained that he has "two customers, one for 100 and the other guy wants 1000". CONCEPCION then tells the caller "I'll see if I can, let me call some people".

Based on their training and experience, their participation in this investigation, and their review of other

---

[1] Copies of the summary log sheets are available for the Court's review upon request.

The Honorable Victor Marrero
August 10, 2007
Page 4

intercepted communications, the monitoring agents believe that, in this conversation, the caller and CONCEPCION were talking about the sale of approximately 1,100 pills of MDMA, which is also known as ecstacy.

### August 8, 2007

On or about August 8, 2007, at approximately 7:10 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, placed a telephone call to an unknown person. During the referenced call, the caller asked CONCEPCION "are you coming to get the 50" and CONCEPCION said that he was. The caller then explained that "the price is fucked up . . . it's like 28 or 29". After discussing the price some more, CONCEPCION told the caller "all right, get it ready, a pure rock".

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, the caller and CONCEPCION were talking about the sale of 50 grams of crack cocaine.

### Need for Continued Interception

The Government submits that the foregoing pertinent calls demonstrate that progress is being made toward the achievement of the authorized objectives of the interception order.

The Government submits that continued interception of wire communications occurring over the TARGET CELLPHONE is necessary to assist in revealing: (i) the plans and methods of operation of the TARGET SUBJECTS as they participate in the TARGET OFFENSES; (ii) the nature and extent of the TARGET SUBJECTS' participation in the TARGET OFFENSES; (iii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iv) the locations and items used by the TARGET SUBJECTS in furtherance of their commission of the TARGET OFFENSES; (v) the existence and locations of records that relate to the TARGET OFFENSES; and (vi) the sources of resources used by the TARGET SUBJECTS to finance their illegal activities.

Although interceptions to date appear to be useful in helping to determine this information, at present the objectives have not yet been fully achieved. Continued interceptions will

The Honorable Victor Marrero
August 10, 2007
Page 5

be useful in furthering the objectives of the investigation.
Based upon the above, we expect to continue monitoring the TARGET
CELLPHONES for the remainder of the thirty-day period authorized
by the Court's July 20, 2007 Order.  The Court will be duly
advised concerning further interceptions and monitoring in
subsequent periodic reports.

          Finally, the Government respectfully requests that,
with the exception of working copies for the Government, this
letter be sealed, impounded, and held in the custody of the
United States Attorney's Office for the Southern District of New
York until further order of the Court.  To this end, I am
enclosing two originals of this letter, as well as a sealing
envelope.

          I can be reached at the number listed below if the
Court has any questions, and to arrange for this letter to be
picked up after it has been received and reviewed.

                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney

          By:    _____
                         John T. Zach/William J. Harrington
                         Assistant United States Attorneys
                         (212) 637-2410/2331

RECEIVED AND REVIEWED:

_____          13 August 2007 4:20 p.m.
THE HONORABLE VICTOR MARRERO                      Date/Time
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

206



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 22, 2007

<u>TO BE IMPOUNDED</u>
<u>UNDER SEAL</u>

<u>BY HAND</u>

The Honorable Victor M. Marrero
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      <u>Re:</u>   <u>**Final Periodic Report Pursuant to**</u>
                <u>**The Court's Order of July 20, 2007,**</u>
                <u>**Authorizing the Continued**</u>
                <u>**Interception of Wire Communications**</u>

Dear Judge Marrero:

      This report is submitted pursuant to the Court's Order,
signed July 20, 2007 (the "July 20, 2007 Order") authorizing the
continued interception of wire communications occurring over the
cellular telephone assigned call number (347) 680-7262, with
International Mobile Subscriber Information ("IMSI") number
316010160198103, and Universal Fleet Mobile Identification
("UFMI") number 176*887*8959, a cellular telephone with
subscriber information of GSD LML, 98 Post Avenue, New York, New
York, with service provided by Sprint/Nextel Corporation (the
"TARGET CELLPHONE"), and any telephone numbers subsequently
assigned to the instruments bearing the same IMSI number as the
TARGET CELLPHONE, as well as any IMSI number subsequently
assigned to the instrument bearing the same telephone number
assigned to either of the TARGET CELLPHONE.

      With regard to the July 20, 2007 Order, the thirtieth
day was August 19, 2007.

      Instructions regarding minimization — the substance of
which was explained, in person and before the monitoring began,
by Assistant United States Attorney Michael Farbiarz to agents of

The Honorable Victor Marrero
August 22, 2007
Page 2

the Federal Bureau of Investigation ("FBI"), other law
enforcement officers, and translators assigned to assist the FBI
in connection with this case — were provided to these persons and
posted in the monitoring plant.  Monitoring of the TARGET
CELLPHONE began pursuant to a prior order, ceased for a period of
time on July 20, 2007, resumed on July 20, 2007 pursuant to the
July 20, 2007 Order, and ceased on August 19, 2007.

### Statistical Overview of Intercepted Calls
### Over the TARGET CELLPHONE

        Interception of communications over TARGET CELLPHONE
from July 20, 2007 up to and including August 19, 2007, have
confirmed that the TARGET CELLPHONE is being consistently used by
the TARGET SUBJECT, ALEXANDER CONCEPCION.

        For the Court's information, the FBI has prepared the
following statistical summary of calls intercepted over the
TARGET CELLPHONE from July 20, 2007 up to and including August
19, 2007:

| | |
|---|---|
| Total Number of Intercepted Calls: | 5048 |
| Number of Complete Calls: | 2103 |
| Number of Minimized Calls: | 5 |
| Minimized Calls Out of Completed: | 0.23% |
| Number of Calls Flagged as Pertinent: | 401 |
| Number of Minimized Calls Flagged as Pertinent: | 0 |
| Number of Calls > 2 Minutes Duration: | 81 |
| Number of Calls Minimized > 2 Minutes Duration: | 3 |
| Number of Pertinent Calls > 2 Minutes Duration: | 51 |
| Calls Flagged as Privileged: | 0 |

The Honorable Victor Marrero
August 22, 2007
Page 3

## Description of Selected Communications
### Intercepted Over the TARGET CELLPHONE

Set forth below are summaries of some of what appear to be pertinent conversations intercepted over the TARGET CELLPHONE during the period from August 8, 2007 up to and including August 19, 2007.  The summaries listed below do not, however, constitute a complete list of the pertinent conversations.  The following descriptions are based upon my review of the line sheets, my review of summaries of certain of the calls completed by the monitoring agents, and discussions with the supervising agents.[1]  Many of the intercepted conversations have been in Spanish.  These conversations are the product of preliminary translation and are subject to further revision.

### August 14, 2007

On or about August 14, 2007, at approximately 3:11 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a telephone call from a person using the name "Johnny Santana".  During the referenced call, Santana asked CONCEPCION if "he can get the rock for Cesar's toy".  CONCEPCION responded that he has already "asked some people" about that.

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, the caller and CONCEPCION were talking about obtaining ammunition for a Cesar LNU's firearm.

### August 15, 2007

On or about August 15, 2007, at approximately 7:18 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a telephone call from an unknown person.  During the referenced call, the caller told CONCEPCION that he had a "toy".  CONCEPCION then asked whether he has "a tira pie", to which the caller responded in the affirmative.  CONCEPCION then said "now we are talking".  CONCEPCION then told the caller that a parking lot in the neighborhood had some money.  The caller responded that he knew the parking lot that CONCEPCION was discussing.  CONCEPCION then told the caller that he was going to "do the parking lot" and that they could do it on Thursday "around 2:00 or 3:00 am".

---

[1]  Copies of the summary log sheets are available for the Court's review upon request.

The Honorable Victor Marrero
August 22, 2007
Page 4

He explained that there was just one person working there and there were no dogs.  They could just kick in the door and there was always money there because it was open 24 hours a day.

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, the caller and CONCEPCION were talking about planning a robbery of a parking lot in the Bronx.

In addition, on August 15, at approximately 7:26 p.m. and 7:28 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, received a two telephone calls from an unknown person.  In those calls, they discussed "the security at Baju [ph]" and CONCEPCION told the caller that "they just have to go to the restroom and come out and freeze everyone".  The caller pointed out that "they have guns at that location", but CONCEPCION stated that "there is money there and he has always been dying to hit the place".  They later identify the location of "Baju" as being on Post Avenue.

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, the caller and CONCEPCION were talking about planning a robbery of a location on Post Avenue, which may be a drug distribution spot.

Later on August 15, at approximately 7:29 p.m., ALEXANDER CONCEPCION, using the TARGET CELLPHONE, placed a telephone call to an unknown person.  In that call, CONCEPCION said that he will try and get information for a car rental.  He explained that the rental agency requires a $1,000 deposit to get the car.  The caller then said that "for something like that the police will get in".  CONCEPCION then said that "the police will just write it up".

Based on their training and experience, their participation in this investigation, and their review of other intercepted communications, the monitoring agents believe that, in this conversation, the caller and CONCEPCION were talking about renting a Mercedes from a car rental agency and then stealing it.

The Honorable Victor Marrero
August 22, 2007
Page 5

## Conclusion

Wire intercepts prior to the Covered Period, as set forth in prior reports to the Court, demonstrate that progress was made toward the achievement of the authorized objectives of the interception order.  Interception revealed certain additional co-conspirators and the manner in which they and the target participated in the specified offenses – including the types of narcotics sold, the method and manner of payment for narcotics transactions.

The Government discontinued interception on August 19, 2007, the date that this Court's order expired.

The Government respectfully requests that, with the exception of working copies for the Government, this letter be sealed, impounded and held in the custody of the United States Attorney's Office for the Southern District of New York until further Order of the Court.

For the Court's convenience, a sealing envelope is enclosed.  Your Honor is requested to sign three copies of this report, place one copy in the sealed envelope and return both the sealed envelope and the additional copies to my attention.

I can be reached at the number listed below if the Court has any questions, and to arrange for this letter to be picked up after it has been received and reviewed.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: _____

John T. Zach/William J. Harrington
Assistant United States Attorneys
(212) 637-2410/2331

RECEIVED AND REVIEWED:

_____     23 August 2007  4:30 p.m.
THE HONORABLE VICTOR MARRERO                    Date/Time
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

211