UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

                  :

UNITED STATES OF AMERICA            **OPINION AND ORDER**

                  :

    - against -                    **07 CR 1095 (SAS)**

                  :

ALEXANDER CONCEPCION,

                  :

            **Defendant.**
-------------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

On November 16, 2007, defendant Alexander Concepcion was arrested and charged with one count of conspiracy to distribute over fifty grams of crack cocaine based on a telephone conversation intercepted on August 8, 2007.[1] Concepcion now moves to suppress all statements obtained from the electronic surveillance of his cellular phone pursuant to an Order dated July 20, 2007 (the "July 20th Order"). Defendant argues that the affidavit in support of that wiretap application failed to establish the unavailability of normal investigative procedures in violation of the statutory requirements for obtaining a wiretap order.[2] The

---

[1]    *See* Indictment - 07 CR 1095 (SAS), Ex. A to the Declaration of Hugh M. Mundy, defendant's former attorney ("Mundy Decl.").

[2]    Title 18, United States Code, section 2518(1)(c) states:

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter . . . shall include the following information: . . . (c) a full and complete statement as to

Government opposes this motion on the ground that certain investigative procedures were tried and failed while other investigative procedures appeared unlikely to succeed or were too dangerous.  For the following reasons, defendant's motion is granted.

## I.    BACKGROUND

### A.    The Wiretaps and Their Objectives

As discussed in greater detail below, this case involves two wiretaps: (1) the first for the period June 20, 2007 through July 19, 2007, and (2) the second for the period July 20, 2007 through August 19, 2007.  The first wiretap was requested on the belief that Concepcion was involved in terrorist activities. During the course of the first interception, however, conversations concerning drugs, not terrorism, were revealed.  Based on these conversations, the

---

> whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .

Title 18, United States Code, section 2518(3)(c) states:

> Upon such application the judge may enter an ex parte order . . . authorizing or approving interception of wire, oral, or electronic communications . . . if the judge determines on the basis of the facts submitted by the applicant that . . . (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .

2

Government changed focus and sought a second wiretap to obtain evidence of Concepcion's drug trafficking activities.

As stated in the affidavit of Special Agent Eric M. Paholsky in support of the second wiretap application, the interception of wire communications was sought to reveal: (1) the nature, extent, and methods of operations of Concepcion's drug distribution organization; (2) the identities of the target subjects, as well as the identities of their accomplices and co-conspirators; (3) the receipt, distribution, and disposition of contraband, money, and other proceeds; and (4) the existence and locations of records and resources.[3]

## B.    The First Wiretap Application

On June 20, 2007, the Government applied for authorization to intercept wire communications from Concepcion's cellular phone for thirty days.[4] In that application, the Government sought such authorization due to Concepcion's alleged involvement in the planning of the following offenses: (1) transport or receipt of explosives; (2) laundering of money in connection with

---

[3]    *See* Affidavit of Special Agent Eric M. Paholsky in Support of Application for Continued Authorization to Intercept Wire Communications ("Paholsky Aff.") ¶ 13, Ex. G to the Mundy Decl.

[4]    *See* Application for Authorization to Intercept Wire Communications, Ex. B to the Mundy Decl.

transfers of funds outside of the United States; (3) use of weapons of mass destruction within the United States; (4) bombing of a public transportation system; and (5) provision of material support to a designated foreign terrorist organization.[5] The application contains no mention of drugs or drug distribution.

The application was signed by a judge of this Court on the date it was submitted.[6] On July 2, 2007, the Government provided a report to the Court describing certain communications intercepted during the first ten days of surveillance ("the First Periodic Report").[7] In addition to two calls purportedly related to firearms trafficking, the First Periodic Report describes an intercepted call involving an alleged narcotics transaction.[8] During the call, Concepcion and an individual named "G" discuss an alleged plan to stash drugs in a car and then at a location near Concepcion's house.[9] This call was unrelated to the offenses for which the application was obtained.

---

[5]    *See id.* at 3.

[6]    *See id.* at 12.

[7]    *See* First Periodic Report Pursuant to the Court's Order of June 20, 2007, Authorizing the Interception of Wire Communication, Ex. C to the Mundy Decl.

[8]    *See id.* at 3.

[9]    *See id.* at 3-4.

4

On July 10, 2007, the Government submitted the Second Periodic Report to the Court.[10] This Report references a single conversation allegedly involving Concepcion's plans to attempt to obtain a small caliber handgun.[11] This Report also describes a call in which Concepcion was asked by an unknown individual if he had a "picture" of hair "grease."[12] The monitoring agents believe that the call involved Concepcion's plan to show a prospective drug buyer a sample of narcotics.[13] Additionally, this Report lists a call in which Concepcion and another man "discussed money" and referred to "two ounce[s]."[14] The agents believe that this call referenced a debt owed to Concepcion.[15] Again, these calls were unrelated to the offenses for which the application was obtained.

On July 20, 2007, the Government submitted the Final Periodic

---

[10]    *See* Second Periodic Report Pursuant to the Court's Order of June 20, 2007, Authorizing the Interception of Wire Communications, Ex. D to the Mundy Decl.

[11]    *See id.* at 2.

[12]    *See id.* at 3.

[13]    *See id.*

[14]    *Id.*

[15]    *See id.*

5

Report.[16] This Report summarizes two separate calls in which Concepcion and

individuals named "Bienve" and "Johnny Santana" purportedly discussed the sale

of cocaine.[17] Finally, this Report represents that "the wire intercepts and other

investigation to date still have not accomplished the authorized objectives" and

reflects the Government's intention "to seek authorization immediately to resume

wire interceptions on [Concepcion's cellular phone]."[18]

### C.    The Second Wiretap Application

On July 20, 2007, the same day as the first wiretap authorization

expired, the Government submitted a second application for authorization to

monitor Concepcion's cellular phone communications.[19] Notably, this second

application omits any reference to any terrorist-related crimes for which the first

application was sought. Instead, the Government requested authorization to

monitor Concepcion's cellular phone for evidence of drug possession and

---

[16]    *See* Final Periodic Report Pursuant to June 20, 2007 Order
Authorizing Interception of Wire Communications Over Cellular Telephone, Ex. E
to the Mundy Decl.

[17]    *See id.* at 3-4.

[18]    *Id.* at 5.

[19]    *See* Application for Order Authorizing the Interception of Wire
Communications Over a Cellular Telephone ("Second Application"), Ex. F to the
Mundy Decl.

6

trafficking.[20] In addition, the Government averred that "normal investigative

techniques have been tried and have failed or reasonably appear unlikely to

succeed if tried."[21] As discussed in greater detail below, normal investigative

techniques allegedly "failed" for a variety of reasons.[22] The application was

signed by a different judge of this Court the day it was submitted.[23]

On July 31, 2007, the Government submitted the First Periodic

Report to the Court, which summarized two conversations during which the

parties purportedly used slang to discuss a drug deal and the planned robbery of a

customer.[24] On August 10, 2007, the Government submitted the Second Periodic

Report to the Court.[25] This Report contains summaries of three calls allegedly

referencing drug transactions, including an August 8, 2007 call that forms the

---

[20]    *See id.* at 3.

[21]    *Id.* at 4.

[22]    *See* Paholsky Aff. ¶¶ 41-54.

[23]    *See* Second Application at 10.

[24]    *See* First Periodic Report Pursuant to the Court's Order of July 20, 2007, Authorizing the Continued Interception of Wire Communications, Ex. H to the Mundy Decl., at 3.

[25]    *See* Second Periodic Report Pursuant to the Court's Order of July 20, 2007, Authorizing the Continued Interception of Wire Communications, Ex. I to the Mundy Decl.

7

basis for the instant charge.[26]

On August 22, 2007, the Government submitted a Final Periodic

Report to the Court.[27] That Report summarizes three calls in which Concepcion

and others allegedly made veiled references to the acquisition of ammunition for a

firearm, the robbery of a parking lot, and the theft of a rental car.[28]  The Report

does not include any information as to calls relating to drug possession or

trafficking.  In the Final Report, the Government averred that "progress was made

toward the achievement of the authorized objectives" of the wiretap and does not

request additional authorization for continued surveillance.[29]

### D.    Relevant Investigative Procedures

According to the Paholsky Affidavit, the interception of wire

communications as of July 20, 2007, was insufficient to permit law enforcement

---

[26]    *See id.* at 4.  During this call, an individual asked Concepcion "are you coming to get the 50" to which Concepcion responded "all right, get it ready, a pure rock."  *Id.*  Based on their training and experience, the monitoring agents believed that Concepcion was discussing the sale of fifty grams of crack cocaine. *See id.*

[27]    *See* Final Periodic Report Pursuant to the Court's Order of July 20, 2007, Authorizing the Continued Interception of Wire Communications, Ex. J to the Mundy Decl.

[28]    *See id.* at 3-4.

[29]    *See id.* at 5.

8

authorities to achieve their objectives relating to Concepcion's drug distribution activities. Specifically, the evidence as of that date failed to confirm and fully reveal the identity of Concepcion's numerous co-conspirators, the locations of any drugs or guns, or the locations of any drug or gun trafficking transactions.[30] The Government alleged that continuing wiretap interception was needed because certain investigative techniques, as discussed below, had been tried but had failed, appeared likely to fail if tried, or were too dangerous to employ.[31]

### 1.    Confidential Informant/Undercover Officer

The Federal Bureau of Investigation ("FBI") began its initial investigation of Concepcion after receiving information from an inmate/confidential informant ("CI") who was Concepcion's cell mate for a two-month period in early 2007, while Concepcion was detained at a correctional facility in Pennsylvania.[32] Believing CI to be a senior organized crime figure, Concepcion asked CI for assistance in procuring weapons and explosives to facilitate attacks on bridges and tunnels within the United States.[33]

---

[30]    *See* Paholsky Aff. ¶ 42. This evidence consists solely of calls intercepted pursuant to the June 20, 2007 Order.

[31]    *See id.* ¶ 41.

[32]    *See id.* ¶ 15.

[33]    *See id.* ¶ 16.

After the focus of the FBI's investigation shifted from terrorist activities to drug distribution, the Government allegedly sought to introduce an undercover law enforcement officer to Concepcion through CI.[34]  These efforts failed, however, because Concepcion stopped accepting CI's telephone calls, which Concepcion knew were being made from the correctional facility in Pennsylvania.[35]  Other than CI, the Government was not aware of any individuals associated with Concepcion who could have been utilized in a covert capacity.[36]  Thus, the Government asserted that the use of undercover officers and confidential informants was not feasible.

### 2.    Physical Surveillance

According to the Government, physical surveillance was of limited utility because none of the target subjects, except for Concepcion, had been definitively identified.[37]  Although FBI agents attempted to conduct physical surveillance of Concepcion on numerous occasions, Concepcion repeatedly changed cars and often drove in an erratic manner, which made surveillance

---

[34]    *See id.* ¶ 45.

[35]    *See id.*

[36]    *See id.* ¶ 46.

[37]    *See id.* ¶ 47.

difficult.[38] Moreover, the Government, noting that drug dealers are typically

extremely conscious of surveillance, feared that an increase in the intensity of

surveillance could have resulted in a cessation of illegal activities by the target

subject and co-conspirators or a change in their instrumentalities or methods.[39]

### 3.    Other Techniques

The Government claimed that other techniques, such as telephone toll

records/pen register devices, grand jury subpoenas, and search warrants were

likely to fail, if utilized.  Telephone toll records and pen register devices provide

only limited information, not including the content of conversations or the

identities of the speakers.[40]  The Government also asserted that it was unlikely that

grand jury subpoenas would lead to the discovery of information as most of the

participants had not been identified or located.[41]  Similarly, the affidavit stated that

search warrants would not have been fruitful given that the locations at which

drugs and weapons were received, stored, and distributed had not yet been

--------

[38]    *See id.*

[39]    *See id.*

[40]    *See id.* ¶ 49.

[41]    *See id.* ¶ 50.

11

identified.[42]  In sum, the Government asserted that alternative investigative
techniques would have failed to accomplish the objectives of the investigation.[43]

## II.    APPLICABLE LAW

The interception of conversations by use of electronic devices is a
"search" within the meaning of the Fourth Amendment.[44]  Title III of the Omnibus
Crime Control and Safe Streets Act of 1968 ("Title III")[45] applies where the
evidentiary use of wiretap evidence is in issue.  "Title III incorporates the Fourth
Amendment's protections by placing probable cause and particularity conditions
on the issuance of a wiretap."[46]  Accordingly, "[s]urveillance that is properly
authorized and carried out under Title III complies with the fourth amendment."[47]

The federal procedures for electronic surveillance are governed by
section 2518 of title 18 of the United States Code ("section 2518").  Under section
2518, an application for electronic surveillance must include "a full and complete

---

[42]    *See id.* ¶ 52.

[43]    *See id.* ¶ 54.

[44]    *See Berger v. New York*, 388 U.S. 41, 51 (1967).

[45]    18 U.S.C. § 2510 *et seq.*

[46]    *United States v. Segura*, No. 3:99CR85, 2001 WL 286850, at *3 (D.
Conn. Feb. 27, 2001).

[47]    *United States v. Bianco*, 998 F.2d 1112, 1121 (2d Cir. 1993).

statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[48]  This statutory requirement will be satisfied if, within the affidavit in support of the wiretap order, the Government explains "what investigative techniques have been utilized, which have proven successful and to what extent, which have proven or will result fruitless once attempted and whether the methods or techniques then or still in use, alone or combined with others not yet utilized, would likely fail to uncover the full extent of the conspiracy."[49]  As a condition of authorizing electronic surveillance, the issuing court must determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."[50]

"[T]raditional investigative techniques include '(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups

---

[48]    18 U.S.C. § 2518(1)(c).

[49]    *United States v. Lazu-Rivera*, No. 03-249(JAG), 2004 WL 3171128, at *9 (D.P.R. Dec. 29, 2004) (citing *United States v. Kahn*, 415 U.S. 143, 153 (1974)).

[50]    18 U.S.C. § 2518(3)(c).

13

by undercover agents or informants,'" as well as "pen registers and trap and trace devices."[51] "If any of these traditional investigative techniques has not been tried, the [G]overnment must explain why with particularity."[52] "[G]eneralities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application. The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap."[53]

The federal statute does not require "that any particular investigative procedures be exhausted before a wiretap may be authorized. Wiretaps are neither a routine initial step nor an absolute last resort."[54] The necessity requirement in the federal statute is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."[55] As explained by the Supreme Court, wiretaps "were not to be routinely

---

[51]    *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003) (quoting *United States v. VanMeter*, 278 F.3d 1156, 1163-64 (10th Cir. 2002)).

[52]    *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002).

[53]    *Cline*, 349 F.3d at 1280-81 (quotation marks and citation omitted, alteration in original).

[54]    *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983) (quotation marks and citation omitted).

[55]    *Kahn*, 415 U.S. at 153 n.12.

14

employed as the initial step in criminal investigation. Rather, the applicant must

state and the court must find that normal investigative procedures have been tried

and failed or reasonably appear to be unlikely to succeed if tried or to be too

dangerous."[56] Thus, "an affidavit offered in support of a wiretap warrant must

provide some basis for concluding that less intrusive investigative procedures are

not feasible."[57]

    The statutory necessity requirement, however, "is far from an

insurmountable hurdle and only requires that the Government demonstrate that

normal investigative techniques would prove difficult."[58] With regard to

necessity, the Second Circuit has stated:

> [T]he purpose of the statutory requirements is not to
> preclude resort to electronic surveillance until after all
> other possible means of investigation have been exhausted
> by investigative agents; rather, they only require that the
> agents inform the authorizing judicial officer of the nature
> and progress of the investigation and of the difficulties
> inherent in the use of normal law enforcement methods.[59]

---

[56]    *United States v. Giordano*, 416 U.S. 505, 515 (1974).

[57]    *Lilla*, 699 F.2d at 103.

[58]    *United States v. Labate*, No. S1 00 CR 632, 2001 WL 533714, at *13
(S.D.N.Y. May 18, 2001) (quotations and citation omitted).

[59]    *United States v. Torres*, 901 F.2d 205, 231 (2d Cir. 1990) (quoting
*United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir. 1979) (quotation marks
and citation omitted)).

While generalized or conclusory statements that other investigative procedures would prove unsuccessful are insufficient to support a finding of necessity,[60] the application must be viewed in a practical and commonsense manner.[61] Furthermore, "[t]he issuing judge's determination that the Government has made adequate use of alternative investigatory techniques is entitled to substantial deference."[62]

## III.    DISCUSSION

Defendant seeks to suppress phone calls intercepted over his cellular phone pursuant to the July 20th Order on the ground that the second wiretap application and the Order authorizing that wiretap failed to meet the statutory requirements regarding normal investigative procedures.[63] More specifically, defendant argues that "the [G]overnment did not start the narcotics investigation of Concepcion – at that point, a suspected low-level drug dealer – by employing

---

[60]    *See Lilla*, 699 F.2d at 104 (reversing convictions where electronically seized evidence was obtained from a state-court authorized wiretap warrant, stating "[l]ike other courts, we reject generalized and conclusory statements that other investigative procedures would prove unsuccessful") (citations omitted)).

[61]    *See Torres*, 901 F.2d at 231.

[62]    *United States v. Trippe*, 171 F. Supp. 2d 230, 236 (S.D.N.Y. 2001) (citing *United States v. Wilkinson*, 754 F.2d 1427, 1433 (2d Cir. 1985)).

[63]    *See* Memorandum of Law in Support of Alexander Concepcion's Motion to Suppress Evidence and Statements at 8-9.

16

techniques proven to bear fruit in similar cases" but instead "immediately resorted

to wiretapping and added after-the-fact justifications for their actions."[64]

> In sum, when the Government's investigative focus
> switched from the alleged terrorist plot to a smattering of
> suspected hand-to-hand drug exchanges, it was required, in
> turn, to shift its investigative methods. It failed to do so,
> instead piggy-backing on the first wiretap authorization
> and forgoing even cursory attempts at alternative and less
> intrusive investigative techniques. This approach violated
> the clear mandates of Title III.[65]

The Government has shown that it has done little, other than the

wiretap, in its investigation of Concepcion's drug-trafficking activities. As stated

in the Paholsky Affidavit, the Government was unsuccessful in introducing an

undercover law enforcement officer to Concepcion through CI because

Concepcion stopped taking CI's calls. It is noteworthy, however, that CI was an

inmate incarcerated with Concepcion for a brief time in Pennsylvania who

discussed whether he could procure weapons for Concepcion in furtherance of his

plan to blow up bridges and tunnels. CI was not involved in any way with

defendant's alleged drug trafficking activities. Thus, using CI to introduce an

undercover agent to Concepcion for the wholly unrelated crime of narcotics

---

[64]     *Id.* at 9.

[65]     *Id.* at 11.

17

distribution was never a realistic option. Moreover, the Paholsky Affidavit does not allege that the use of an undercover agent was contemplated for the purpose of buying drugs from, or selling drugs to, Concepcion. Therefore, the Government's discussion of its inability to introduce an undercover agent through CI is a *non sequitur*. It appears that the Government attempted to apply investigative work related to defendant's alleged terrorist activities, for which the first wiretap was properly granted, to the subsequent investigation of defendant's alleged drug distribution activities. Such an approach is impermissible.

Over the years, I have presided over numerous drug cases where the Government has used both confidential informants and undercover agents without the benefit of a former cellmate's assistance. Through physical surveillance, which appears to have been underutilized here, the Government could have taken photographs of Concepcion's associates, friends, and other visitors. By comparing these photographs to various FBI and other law enforcement databases, the identities of at least some of defendant's associates and friends might have been ascertained. With this information, an undercover agent could have tried to befriend one or more of Concepcion's associates and thereby infiltrate Concepcion's purported drug dealing organization.

But the only physical surveillance conducted by the Government was

when Concepcion left the house and drove different cars in an "erratic manner." The Government does not offer a satisfactory answer as to why surveillance of Concepcion's home, where drugs were allegedly stashed, would not have yielded any useful information. In short, the normal investigative technique of physical surveillance was never fully employed.[66] Instead, the Government resigned itself to the foregone conclusion that surveillance was of limited utility because drug dealers are "extremely surveillance conscious."

In fact, in the Paholsky Affidavit, the Government explains why every type of investigative technique either failed or was likely to fail. Accepting the Government's argument would mean that nearly all drug distribution investigations would require a Title III wiretap. This is simply not the case. Countless drug investigations are conducted without the benefit of a wiretap.

Indeed, in *United States v. Lilla*, the Second Circuit observed that the relevant affidavit "does not enlighten us as to why this narcotics case presented

---

[66]    *See United States v. Castillo-Garcia*, 117 F.3d 1179, 1195 (10th Cir. 1997) (affirming district court's decision to suppress evidence obtained from a number of wiretaps because the supporting affidavits "simply failed to contain any evidence, other than conclusory evidence that would apply to virtually all drug conspiracy investigations, that 'normal investigative procedures' – particularly 'standard visual and aural surveillance' – would have been unlikely to succeed") (emphasis omitted) (*overruled in part on other grounds by Ramirez-Encarnacion*, 291 F.3d at 1222 n.1).

19

problems different from any other small-time narcotics case . . . ."[67]  The Circuit

court reversed the trial court's conclusion that there was sufficient evidence to

conclude that traditional techniques would not be effective.[68]  As in *Lilla*, the

problems described in the Paholsky Affidavit are problems common to every

narcotics investigation.

            In cases where wiretaps have been properly authorized, some

evidence has been previously obtained through the use of normal investigative

techniques, these techniques have been tried and failed, or the Government has

made a substantial showing that these techniques would be unsuccessful.  For

example, in *United States v. Torres*, the Government first established that "the

Torres Organization was a large scale operation which could not be adequately

surveilled by traditional investigative methods."[69]  The relevant affidavit

"described the investigation of the Torres Organization over a fourteen-month

period, explaining in detail the traditional investigative techniques employed,

including the use of two confidential informants, physical surveillance, record

---

[67]    *Lilla*, 699 F.2d at 104.

[68]    *See id.* at 104-05.

[69]    901 F.2d 205, 232 (2d Cir. 1990).

20

checks and pen registers."[70]  Similarly, in *United States v. Puglisi*, the Government

affirmed that visual surveillance had been unsuccessful, that confidential

informants had failed to penetrate the conspiracy, that surveillance had been

performed for six months, that pen registers had been used for five months, and

that the FBI had received information from informants over a two-year period.[71]

Investigations would progress faster and might well yield better

results if they had the benefit of a wiretap.  But that is not the law.  Although a

wiretap is efficient, its efficiency cannot dispense with the need to use normal

investigative techniques before conducting such an intrusive search.  As noted in

*United States v. Lilla*, Congress has made the "judgment that the cost of such

efficiency in terms of privacy interests is too high."[72]

Here, the Government simply bypassed other more conventional

techniques in favor of an already existing wiretap which, although intended to

---

[70]    *Id.*

[71]    *See* 790 F.2d 240, 241-42 (2d Cir. 1986).  *See also United States v. Mullen*, 451 F. Supp. 2d 509, 533-34 (W.D.N.Y. 2006) (observing that the Government had used techniques including "telephone call toll records, pen register analysis, physical surveillance, obtaining the criminal history of the subjects of the investigation, a grand jury subpoena of [relevant] bank records and the [relevant] persons and businesses").

[72]    699 F.2d at 105 n.7 (citing *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1975)).

21

produce evidence of terrorism, instead produced evidence of drug transactions. It is not surprising that the Government wished to succeed in its investigation and do so rapidly. However, intrusive electronic surveillance without the appropriate safeguards is an impermissible shortcut.[73]

## IV.   CONCLUSION

For the reasons stated above, defendant's motion to suppress all evidence seized electronically is granted. The Clerk of the Court is directed to close this motion (document no. 13). A status conference is scheduled for July 9, 2008 at 4:00 p.m.

---

[73]   This holding does not disregard the deference due to the judge who signed the second wiretap order. At the time the July 20th Order was presented, the issuing judge heard only from the Government. Given the benefit of the adversary system, this Court is provided with a fuller picture of whether "normal investigative procedures" were pursued to an adequate degree. *See Kalustian*, 529 F.2d at 589 ("[T]he utmost scrutiny must be exercised to determine whether wiretap orders conform to Title III [which] has been declared constitutional only because of its precise requirements and its provisions for close judicial scrutiny."). In any event, if "substantial deference" meant absolute deference, no court would ever grant a motion to suppress evidence obtained pursuant to a court-ordered wiretap. *See, e.g., Lilla*, 699 F.2d at 105 (suppressing evidence obtained pursuant to a court-ordered wiretap); *Castillo-Garcia*, 117 F.3d at 1195 (affirming suppression by the district court of evidence obtained pursuant to a court-ordered wiretap).

22

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.


Dated:      New York, New York
            June 30, 2008

## - Appearances -

**For Defendant:**

Martin S. Cohen, Esq.
Federal Defenders of New York, Inc.
52 Duane Street - 10th Floor
New York, New York 10007
(212) 417-8737

**For the Government:**

John T. Zach
Assistant U.S. Attorney
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2410